**RYAN MORTGAGE INVESTORS et al., Appellants,**

v.

**BERTON LAND DEVELOPMENT CORPORATION et al., Appellees.**

No. 7962.

Court of Civil Appeals of Texas, Beaumont.

Aug. 15, 1978.

Stan Harrell, Fort Worth, for appellants.

Benton Musslewhite, Houston, for appellees.

CLAYTON, Justice.

This case has been reversed and remanded by our Supreme Court for a determination by this court of whether the action of the trial court in overruling defendant Ryan's plea of privilege may be affirmed under any of the pleaded venue exceptions.

Appellees, plaintiffs below, instituted this action seeking damages based upon misrepresentations made by agents of appellants and also seeking a temporary injunction to prevent foreclosing a deed of trust covering certain lands situated in Montgomery County. Appellant Ryan filed its plea of privilege to be sued in Tarrant County. The trial court overruled the plea of privilege and granted the temporary injunction *

---

\* In our former opinion, 556 S.W.2d 361 (1977), the temporary injunction granted by the trial court was dissolved. The Supreme Court, in reversing this judgment, made no mention of

from which orders appellant has perfected its appeal.

The trial court filed extensive findings of fact and conclusions of law and held that venue was maintainable in Montgomery County under *Tex.Rev.Civ.Stat.Ann. art. 1995, §§ 7, 14,* and *23* (1964).

Appellees, Berton Land Development Corporation (Berton), a Texas corporation, three guarantors on the promissory note, and an unsecured creditor of Berton, were in a group planning to create a recreational community on 1,476 acres on Lake Conroe in Montgomery County. On December 1, 1972, Associated Mortgage Investors (AMI) issued its commitment letter to Lake Conroe Equities, Inc., a predecessor in title to Berton, whereby AMI committed itself to make a land acquisition loan in the amount of $7,300,000. On December 28, 1972, Berton executed a promissory note in such amount. Also, on that date, the individual plaintiffs along with five other individuals, executed a guarantee agreement in which they guaranteed payment of the loan. On January 5, 1973, Berton executed a deed of trust upon the land to secure the payment of the note. Although AMI was named as payee of the note, it was actually a joint participation of three real estate investment trusts with the appellant Ryan acting as the "lead" lender. Subsequently, the indebtedness was assigned to Ryan. Appellees contend that Ryan's agents made false representations that a development loan would be made to Berton. Efforts to secure the development loan were unsuccessful; and, when the land acquisition note became due one year from the date of its making, it was not paid by Berton, and the note remains unpaid and in default.

According to the evidence presented to the trial court, it is undisputed that, from the beginning of the negotiations of all parties, the goal of the lenders and the owners was to secure a land acquisition *and* development loan, and that the only way

the acquisition and development loans could be paid would have been through development of the property as a lake resort community. At the insistence of Mr. Thorne, who was the Executive Vice-President of Ryan, the acquisition loan was made and AMI was given the written option "to make the contemplated development and construction loans for future site improvements at the following rates and terms: [followed by a proposed interest rate for a term of three years]."

There is testimony in the record that the land acquisition loan proposed by Thorne, which was a one year loan, with an approximate six months interest reserve, with no partial release clause, with no immediate availability of development funds, was considered by appellees to be a bad and a dangerous loan. Appellees expressed their concern about this "danger," and their testimony is to the effect that appellees would not have closed or consummated the original land loan had it not been for the representations of Thorne that a development loan would be made and funded within 120 days; or, as one of the principals of Berton testified, that Thorne stated and represented that if the principals of Berton and the landowners would close the land loan the development loan would be funded "automatically," and it was in reliance upon these representations that appellees agreed to close out the original land loan.

The record is replete with statements that Berton and other appellees would not have closed out the land acquisition loan had it not been for the representations of Thorne that the development loan was automatic and would be forthcoming. In the words of the President of Berton, referring to the land acquisition loan, "No—I would not have recommended it; it's suicide." It is also shown by the evidence that Thorne, prior to the closing of the loan, represented that the trusts involved herein, particularly

the dissolution of such temporary injunction but reversed the judgment solely upon the question of venue and remanded the cause "for determination of whether the action of the trial court in overruling Ryan's Plea of Privilege may be affirmed under any of the pleaded exceptions to exclusive venue." For this reason we do not consider the matter of the temporary injunction now being before this court.

AMI, had the capability of making the development loan and that AMI and Larwin were large trusts fully capable of making the development loan but that AMI, as lead lender, would be the one that would probably fund the development loan; at no time did Thorne mention any financial problems in AMI or that AMI had a loan limit which would preclude the making of the development loan. Thorne admitted that he knew that AMI had a loan limit prior to closing the loan and admitted that "I don't believe that I discussed this loan limit with them particularly; I had no reason to."

The only thing that had to be done in order to secure funding of the development funds, once the land loan was closed, was the completion of what was called the "development package." Thorne approved the credit of the principals insofar as both the land and development loan was concerned, the viability of the project, the general design of the project, and all that was left to do was to "assemble the development package." Testimony shows that such a development package was completed and that it was totally satisfactory.

In less than two months from closing the loan, AMI refused to fund the development loan because "the present balance is the maximum that AMI can fund on one specific loan and that they did not agree with the development concept contained in the 'package.'" is noted that the record reflects that Thorne represented AMI in this transaction and that the "package" had been prepared with his help and cooperation and had been accepted by him. AMI had gone into bankruptcy within six months after the loan closing.

There is further testimony that Thorne admitted to the witness Tweedy, that "he [Thorne] let on to me like he never thought the thing would run with the principals involved. . . . He let on like the players never could fund the loan and it was known from the start." To the question "did he [Thorne] ever say anything about whether he thought he was going to have to foreclose on the property from the start," the witness answered, "Yes," and that "he

[Thorne] thought they ought to make a profit" (on the foreclosure). Tweedy, with reference to obtaining a buyer for the land, testified that "He [Thorne] said if I found a buyer . . . to keep them under wrap until, you know this foreclosure thing is done and because they are behind on interest and all of that it looks like we're going to foreclose. But keep it under wraps now and I can't talk about it right now. But any time you want to call me collect is find [sic]. Let me know what's going on."

Based upon the evidence, the trial court found that defendants committed fraud through the representations of Thorne and found that not only did they make false representations that they would provide a development loan and had the capability of providing a development loan but also that at the time they made such representations "the defendants had no intent to fulfill the representations and furnish the development loan." The trial court further found "that the representations were relied upon by the plaintiffs, and, but for such representations, the plaintiffs would not have concluded the land loan; that the "representations that the defendants had the means and capability to furnish the development funds were false representations," which were relied upon by the appellees; and that appellees sustained damages as a result of all of such misrepresentations. Based upon these findings, the trial court concluded that venue was maintainable in Montgomery County under *Tex.Rev.Civ. Stat.Ann. art. 1995, § 7* (1964).

Fraud is determined from the "words or other conduct manifesting to another the existence of a fact, including a state of mind." *Custom Leasing, Inc. v. Texas Bank and Trust Company of Dallas,* 516 S.W.2d 138, 142 (Tex.1974). All the facts and circumstances leading up to and connected with the transaction are, ordinarily, admissible and may be considered. *Isenhower v. Bell,* 365 S.W.2d 354 (Tex.1963). If a representation is one to do a future act, the intention not to perform that act may be proven by circumstances. *Blanton v. Sherman Compress Company,* 256 S.W.2d

884 (Tex.Civ.App.—Dallas 1953, no writ). Intent is to be determined from a consideration "of all the acts and declarations of the company's representatives . . . coupled with its subsequent conduct in reference to carrying out or refusing to carry out the verbal agreement." *Tatum v. Orange and N. W. Railway Company,* 245 S.W. 231, 232 (Tex.Com.App.1922, opinion adopted).

■ The evidence is factually sufficient to support the findings of the trial court as to actionable fraud occurring in Montgomery County, and its conclusion that venue is maintainable in Montgomery County under the provisions of *Tex.Rev.Civ.Stat.Ann. art. 1995, § 7* (1964), is correct, and the trial court properly overruled appellants' plea of privilege.

No error being shown, the judgment of the trial court is affirmed.

AFFIRMED.

KEITH, Justice, concurring.

In remanding the cause to this court, the Supreme Court directed that we determine "whether the action of the trial court in overruling Ryan's Plea of Privilege may be affirmed under any of the pleaded exceptions to exclusive venue." 563 S.W.2d 811, 812 (Tex.1978). The mandate of our Supreme Court has now been complied with, and I do not dissent nor do I disagree with the holding.

Nothing said by the Supreme Court or by this court in today's opinion detracts from the viability of the doctrine of res judicata as discussed in our prior opinion, 556 S.W.2d 361, 363 (1977). The facts supporting such plea are of record, and it must now be heard in Montgomery County—not Tarrant County. That, I submit, is the effect of today's holding.