STATE NATIONAL BANK OF EL PASO, Appellant,

v.

FARAH MANUFACTURING COMPANY, INC., Appellee.

No. 08–82–00160–CV.

Court of Appeals of Texas, El Paso.

Aug. 29, 1984.

Rehearing Denied Nov. 7, 1984.

Marvin S. Sloman, Robert L. Blumenthal, Carrington, Coleman, Sloman & Blumenthal, Dallas, Robert J. Hearon, Jr., Pamela Stanton Baron, Graves, Dougherty, Hearon & Moody, Austin, Raymond C. Caballero, El Paso, for appellant.

Tom Thomas, Kolodey, Thomas, Dooley & Yeager, Dallas, for appellee.

Before STEPHEN F. PRESLAR, C.J., and WARD and SCHULTE, JJ.

## OPINION

SCHULTE, Justice.

This case centers around a management change clause contained in a $22,000,000.00

loan agreement. The jury found Appellant bank, acting alone or in conspiracy with any of the other lenders, committed acts of fraud, duress and interference, proximately resulting in damages to Appellee, and set damages at $18,947,348.77. We reform and affirm.

The management change clause set forth in Section 6.1(g) of the February 14, 1977, loan agreement made it an event of default if there occurred:

Any change in the office of President and Chief Executive Officer of Farah [Manufacturing Company, Inc.] or any other change in the executive management of Farah [Manufacturing Company, Inc.] which any two Banks shall consider, for any reason whatsoever, to be adverse to the interests of the Banks.

For space economy we will refer to individuals involved by surnames only unless the same surname for different individuals requires the addition of a given name or initials for clarity. William F. Farah will be referred to as Farah. His son, Jimmy Farah will be J. Farah; Farah Manufacturing Company, Inc. will be denoted by the initials FMC. The State National Bank of El Paso will be State National; Continental Illinois National Bank and Trust Company of Chicago will be merely Continental; Republic Bank Dallas N.A. (formerly Republic National Bank of Dallas) will be Republic; The Prudential Insurance Company of America will be called Prudential. Prudential was a separate creditor of FMC pursuant to a 1971 loan agreement. An amended and restated creditors' agreement included Prudential and was made part of the February 14, 1977, loan agreement. Where dates indicate a month only, the year intended is 1977; otherwise the year will be shown. Chief Executive Officer will be denoted as CEO; Chief Operating Officer by the letters COO.

As to the facts, certain events require preliminary mention. FMC began in 1919 as a family owned apparel manufacturer. Farah became CEO in 1964. In 1967 FMC went public. By 1970, the company had plants in Texas and overseas with annual sales of $136,000,000.00. Beginning in 1972, the firm suffered a strike and a nationwide boycott. The strike was settled in 1974. During the period 1972–1976 FMC experienced a pre-tax loss of $43,965,-000.00. On July 9, 1976, the FMC Board named one of its members, Leone, as CEO of FMC replacing Farah. On February 14, 1977, a preexisting loan agreement between FMC, State National, Continental and Republic was amended and included the management change clause previously set forth. At the following March 7 Annual Directors' Meeting, Farah made a presentation to be reinstated as CEO. Within days thereafter, Frost, Kozmetsky, Leone and Lerner resigned as directors. Leone remained, however, as CEO. On March 14, Farah made his management presentation to the lenders at Republic in Dallas. Republic was the agent bank for the lenders. Two days later, Farah met Bunten, Senior Vice-President of Republic, on an airplane going to New York. Farah testified that as a result of what he understood Bunten to say, regarding FMC management, he (Farah) cut his New York merger effort short and returned to El Paso, Texas, to prepare to resume control of FMC as CEO. Conroy, a director of FMC, as well as of State National, let the lenders know that he too was available to be CEO. On March 15, Bunten of Republic named Tom Foster of Republic to handle the FMC loan. Tom Foster hired attorney Donohoe to assist him. On March 18, the FMC Board reconvened. Farah pressed his bid to be CEO. Azar was elected a director. Director Gordon Foster was designated to ask the lenders for their position on a management change. On March 19, Conroy met with Azar, the possible swing director, to urge his own candidacy for CEO. Azar initially rejected Conroy. The next day Conroy met with Houghton, a State National vice-president, who had previously worked for Farah at FMC. Houghton tried to discourage Azar's support of Farah. On March 21, the lenders met again at Republic in Dallas and Tom Foster and attorney Donohoe left for El Paso. On March 22, Donohoe drafted and Tom Foster signed and delivered the

lenders' response to the management query from the FMC Board. That day also saw a meeting between the lenders and Director Gordon Foster, and a meeting between the lenders and Conroy. On March 23, the lenders faced Azar and Farah; Conroy was elected CEO replacing Leone and Gordon Foster was elected Chairman replacing Farah. On the same day, Continental met with consultant Galef. On April 4, the following were elected to the FMC Board: Pulley, a recently retired Republic officer who had originally approved the FMC loan; Williams, who was also a director of State National; and Jaynes, who had originally declined, asserting a conflict of interest, and reconsidered at the request of Gordon Foster.

On May 27, at the instance of the lenders, FMC hired Galef as consultant. On July 30, Conroy resigned as CEO and Galef was elected to that office. The fall of 1977 saw litigation between Farah and the directors. The terms of the settlement released the directors from all claims asserted in this present suit. Under Galef, on October 4–6, some FMC machinery was auctioned and sold. On November 15, the mill auction was held. During November both Farah and Azar resigned from the FMC Board. In January, 1978, Farah initiated his proxy fight. In that regard in March 1978, Farah prevailed in litigation brought against him by Clifford and Virginia Farah to remove Farah as trustee under the trust holding their stock. The loan was restructured on April 3, 1978. Four days later Galef was out and Farah was again CEO of FMC.

State National Bank, defendant below and Appellant here, characterizes the case as one arising out of warnings issued to FMC in March, 1977, by Republic, State National and Continental in reliance on the management change clause above set forth. Appellant's position is that when Farah attempted to persuade FMC's board to elect him CEO, the banks stated their intent to enforce their right under the loan agreement to treat Farah's election as a default and call their loan. Appellant insists that the warnings of the banks did not exceed their legal rights under the change clause (and otherwise) and further that FMC failed to adduce evidence to establish a cognizable cause of action. State National maintains that the banks made the loan to FMC in reliance upon FMC's assurances in 1976 that the company was under new management and that the banks would be protected by the management change clause against any future change in management. It is also maintained by State National that the covenant was a provision freely given by FMC, that it was undisputedly lawful, and that the subsequently strengthened and amended clause was approved by the entire FMC board with the clear understanding that the covenant could be used to resist an effort by Farah to return as CEO.

On the other hand, FMC, plaintiff below and Appellee here, asserts the general position that under the management change clause, when it became apparent that Farah was about to regain control of FMC, which was unacceptable to the banks, that the banks had two legitimate options. They could attempt to call the loan or elect not to and live with Farah as CEO. Instead, Appellee maintains, the banks chose a third option and unlawfully prevented Farah's election and installed directors and officers to keep Farah out of management. The claim is made that the "hand picked minions" mismanaged the company and stripped it of valuable assets for unnecessary loan prepayments. Further, Appellee asserts, when the banks defrauded and coerced FMC's directors to prevent Farah's return to management, they defrauded and coerced FMC itself. When they installed their own choice of management, stacked the FMC board and undertook the actions to exclude Farah from management, the banks interfered with FMC's management and corporate governance rights through an unlawful course of conduct marked with deception and coercion. These alleged wrongful acts are stated to have proximately caused damages to FMC in two respects. First, the incompetent management installed and perpetuated by the

banks resulted in losses and auction sale damages. Second, their preventing the election of competent management caused losses and lost profits. Appellee finally contends Farah fought his way back into control, saved the company from bankruptcy and restored it to profitability.

The case before us was in trial for over two months, resulting in a statement of facts of some seven thousand pages and exhibits of over two thousand pages. The jury of twelve received the case on December 30, 1981, and returned its verdict on January 13, 1982. Ten members of the jury in response to special issues found that the State National, acting alone or in conspiracy with any of the other lenders, at any time after February, 1977, committed any act or acts of:

Question No. 1A. Fraud

Question No. 1B. Duress

Question No. 1C. Interference

Question No. 2. Proximately causing as to 1A, 1B and 1C, damages to FMC as follows: (conditioned on an affirmative answer to any or all of 1A, 1B, or 1C above)

Question No. 3A. Actual losses after March 23, 1977—$2,668,000.00.

Question No. 3B. Lost profits after March 23, 1977—$15,482,500.00.

Question No. 3C. The difference between market value and actual sale prices of assets and equipment sold at auction sales—$721,848.77.

Question No. 3D. Lost profits from auction sales—$75,000.00.

Further in response to Questions Nos. 4 and 5, the jury found that the acts previously inquired about were not actuated by malice and therefore fixed no exemplary damages. The trial court overruled State National's motion for judgment non obstante veredicto and entered judgment on the verdict. State National's motion for a new trial was overruled.

State National raises twenty-seven points of error, essentially attacking the legal and factual sufficiency of the evidence to support the jury's findings to special issue Questions Nos. 1A, 1B, 1C, 2, 3A, 3B, 3C,

and 3D previously set forth as well as the conspiracy finding in the preface portion of Question No. 1. Additional points urge that as a matter of law FMC did not have an actionable claim for fraud, duress or interference; that as a matter of law FMC is not entitled to damages for lost profits and auction sales. Other points urge error in submission of Questions Nos. 1 and 3, and in the admission of certain evidence. A final point asks the judgment be reversed and rendered or alternatively reversed and remanded. FMC urges a cross-point that the trial court erred in defining malice in connection with exemplary damages, and two conditional cross-points regarding exclusion of evidence and the denial of an order to produce.

 In that many of the points of error concern legal and factual insufficiency assertions, we set forth here the standards of review we apply to such points to avoid repetition under each of them. In considering a "no evidence" legal insufficiency point, we consider only the evidence which tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher*, 623 S.W.2d 769 (Tex.App.—El Paso 1981, no writ). It is not within the province of the court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness' testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d

508 (1947); *Clark v. National Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820 (1947).

Before beginning a discussion of the points of error, we will expand on certain evidence previously outlined indicating in part the position of the parties in regard thereto, with a further factual treatment under the points as appropriate. Appellant's version of the facts covers over sixty pages of its original brief and that of the Appellee some one hundred pages. Appellant's supplemental response to Appellee's statement of facts covers an additional seventy-eight pages of statement of facts. We will be as sparing as possible.

Following the strike and boycott of 1972–1974, and substantial losses, on March 3, 1976, the FMC Board unanimously elected Leone, an FMC director since 1973 and chosen by Farah to succeed him, as president and COO. Farah retained his positions as board chairman and CEO. Farah assigned to Leone nearly all executive responsibility in expectation that Leone would offer a different style of management. The lenders had no input in Leone's election. On the same day, Farah's son, J. Farah, was elected as a director. The board then consisted of Farah, J. Farah, Conroy, Leone, Gordon Foster, Frost, Kozmetsky and Lerner.

At its meeting on July 9, 1976, the board demanded that Farah resign as CEO. A resolution, introduced by Farah and naming Leone as new CEO, was passed. Farah retained the title of board chairman, a ceremonial position with no management responsibilities. His resignation as CEO was demanded on the basis that he was the cause of FMC's management problems and poor financial condition.

Farah later deemed Leone incapable of properly managing the company and unable to quickly adjust to changes in market demand for fashions. Under Leone, FMC's sales and profits declined. Farah urged Leone to change his practices. Both Leone and the board viewed this as unwarranted interference.

In the spring of 1976, FMC had begun to seek a $30,000,000.00 loan to survive losses. An interim agreement was arrived at to be followed in October, 1976, by a finalized loan agreement. Both contained management change clauses. On February 14, 1977, a restructured collateralized loan agreement was reached. FMC maintains that the appraised value of the collateral was $72,000,000.00 which amount is disputed by State National. This latest agreement had the strengthened management change clause earlier set forth in this opinion.

At a shareholders' meeting on March 7, 1977, Farah sought to have a new board of directors elected to insure his return to management. Farah proposed to the board that he be elected CEO. Several factors induced him to change his mind and to vote for the incumbent board which he believed would elect him CEO anyway. Because of the management change clause, the board declined absent a statement of position from the lenders. The lenders initially refused to assert a position. The board suggested Farah personally present his management proposal to the lenders. He did so at Republic in Dallas on March 14, 1977, stressing his return as CEO was the only way to save FMC. After his presentation, Farah was asked to leave the meeting so the lenders could discuss the matter. State National voiced opposition to Farah. No decision was reached. Farah was informed of their indecision and that a change in CEO could constitute a violation of the management change clause. FMC Director Conroy, unknown to Farah, let the lenders know of his (Conroy's) interest in becoming CEO. Conroy was also a director of State National. As of March 14, the lenders knew that if Leone resigned, his successor would be either Farah or Conroy. As stated, Republic was the agent bank for the lenders, including Prudential. On March 15, Bunten of Republic, assigned the daily handling of the loan to Tom Foster of Republic. Tom Foster hired attorney Donohoe to assist him.

On March 16, Farah talked to Bunten, the senior loan officer of Republic, on a

flight to New York and repeated the proposal he had made to all the lenders in Dallas two days before. Farah testified, "[h]e (Bunten) said he felt that we ought to disregard the covenant as being boiler plate, they had it in all of their agreements, and run the business and get the thing back in shape." Farah began planning his return to management. Leone tendered his resignation as CEO on March 17. On March 18, Lerner resigned from the board. (Frost and Kozmetsky had resigned on March 9). Farah nominated three new directors. Only Azar accepted. He was elected. Farah demanded he (Farah) be elected CEO. The directors resisted and Director Conroy asked to be named CEO. Conroy stated the management clause was designed to exclude Farah. Gordon Foster noted a potential default in the loan, and the board named him to talk to the lenders. On March 18 and 19, Gordon Foster talked to Tom Foster, in support of Conroy for CEO. Tom Foster testified from his notes of that meeting that Farah had a probable three of the five directors' votes for CEO. Conroy met with Azar conveying his own desire to be CEO. Azar persisted in his support of Farah in talking to Conroy and Houghton of State National. Azar in speaking to Houghton learned that Houghton believed Farah to be incapable, and he expressed to Azar his bitterness and anger toward Farah in a business sense. Notes prepared by Bettina Whyte of Continental reflect the feeling of that bank that if Farah were elected he should be strongly controlled and have life made miserable for him.

Attorney Donohoe met with Tom Foster on March 20 to determine his course at the March 21 lenders' meeting. Tom Foster's notes indicate the alternatives discussed. One note indicated Azar was viewed as the swing vote on the board in probable favor of Farah. The lenders met on March 21. State National opposed Farah. Attorney Smith for State National testified that the bank's initial participation in the loan had been reliant upon Farah's noninvolvement in management and the inclusion of the management change clause. Continental's position was similar.

The lenders analyzed the ramifications of FMC's bankruptcy, should a default be declared, and their exposure to liability for changes in FMC management. According to the testimony of Daugherty, President of State National, the lenders felt that their only legitimate options, should Farah become CEO, were to either call the loan or let Farah hold office unmolested. Daugherty testified that neither choice was acceptable to the banks. They were adverse to the bankruptcy of FMC. As FMC was not otherwise in default on the loan at the time, State National was unwilling to put El Paso's largest private employer into bankruptcy.

Notes regarding the lender meeting of March 21 in Dallas appear at pages 8575–76 of the documentary portion of the statement of facts. These were identified by Bettina Whyte of Continental and received in evidence. As identified therein and through Whyte's testimony, it appears that the following were present: attorney Smith, Houghton and Updike from State National, Bunten, Tom Foster and attorney Donohoe from Republic, Jim Wilson and Bettina Whyte. The notes as deciphered by Whyte conclude with Bunten's plan: (1) Willie [Farah] stay on as chairman; (2) Name Conroy or Conroy and Leone as president and COO; (3) Tell Willie we pull the plug if he goes in as CEO; (4) Willie work for merger only; and (5) whoever is running it, follow Willie's plan and be endorsed by Willie. The notes finally conclude with "[w]e'll take any management other than Willie." In addition to the notes, when asked if any decision had been made on March 21 to call the loan if Farah were elected CEO, Whyte responded, "[t]here was no decision."

There is some evidence from State National that the lenders had agreed on March 21 to put FMC on notice that a default would be declared under the management change clause should Farah be elected CEO and to call the loan and to immediately accelerate the debt. However,

there is other evidence that a decision regarding default had not been reached on March 21. In addition to the testimony of Whyte, Matkin, Chairman of the Board of State National, testified that he did not think a decision to default had ever been made. Boyer of State National testified that State National had decided to call the loan if Farah returned to CEO; however, he could find no reference to any such decision in the loan committee minutes. Testimony conflicts as to whether a default would occur automatically upon Farah's election or whether it would require a subsequent decision. Tom Foster and Donohoe were instructed to attend the upcoming board meeting and to advise the board of the lenders' position. Donohoe testified by deposition that he was not authorized to tell FMC that there would be a default if Farah was elected, nor was he authorized to say that there would have to be another meeting of the lenders before any default would be declared regarding that as his "business." He maintained that no decision had been made to call the loan at the Dallas meeting of March 21. He responded that to tell the board there might never be a default declared could be misleading. He also acknowledged that telling them that default would not be waived could create the impression there was going to be a default.

Then on March 22, Donohoe drafted a letter conveying the lenders' position to the board. The letter approved by all the lenders was signed by Tom Foster and delivered to Gordon Foster prior to the board meeting to be held that day. Farah testified that at the time of the board meeting he was unaware of the lenders' meeting of the previous day. He anticipated he would be elected CEO and that his election would be approved by Bunten of Republic, to whom he had spoken on the plane trip to New York. The letter of March 22 read in part:

> The Banks wish to advise the Board that a change of executive management which includes the election of Mr. William Farah as chief executive of the Company or results in his being the power to generally supervise and control the operations and affairs of the Company is unacceptable to the Banks, and the Banks will not grant any waiver of default based thereon. The Banks are, however, willing to consider a waiver of the default clause ... if the Board decides that a change in the office of the Chief Executive of the Company (involving others than Mr. Farah) is in the best interests of the Company. The Banks do not intend hereby and do not waive any default based on the developments in the Company constituting a material adverse change of circumstances .... The Banks are still considering their position regarding the events which have and are coming to their attention.

Tom Foster testified that the lenders did not want to call the loan and create a default which would result in FMC's bankruptcy. He admitted that, if Farah were elected, the lenders had a choice of either doing nothing or attempting to call the loan. Although the interpretation of the letter was left to the board, he conceded that the statement of the lenders, that they would not waive a default, could have created an impression that there would be a default if Farah were elected. He admitted that the "clear understandings" set forth in the further portion of the letter which read:

> Mr. Farah has been making serious efforts to take over the operating management of the company, contrary to what we thought were the clear understandings of the Banks and Company....

were not expressed in the loan agreement. He also conceded that the loan agreement did not pertain to the election of directors.

Gordon Foster presented the letter to the board. Farah disregarded it as inconsistent with what Bunten had told him. J. Farah decided to cast his vote for Leone to remain as CEO. Gordon Foster warned the board it could not vote to put FMC in default and that the loan would probably be called if Farah were elected. Azar testified that the letter gave him the impression

that the lenders would close the company or call the loan if Farah were elected. Farah nominated Richard Jaeger and Charles Wood as directors hoping that their presence on the board would insure his election as CEO. Gordon Foster and other directors took exception to these nominations. The meeting was recessed without an election of new directors or CEO.

Afterwards, Gordon Foster met with the lenders and told them of Leone's pending resignation and that Farah, who would continue his efforts despite the letter, would be elected unless he were stopped in some manner. He also told them that Conroy still wanted to be CEO and that Wood and Jaeger would probably be elected at the next day's board meeting. Gordon Foster admitted having testified on a prior occasion that the lenders then discussed the forthcoming removal of Farah. Attorney Smith denied such discussion but admitted the likelihood of Farah's election at that point. Tom Foster also so conceded and added that the lenders would either have to accept Farah or to call the loan. The lenders then met with Leone to confirm his desire to resign as CEO and with Conroy, who expressed his interest in the position.

Gordon Foster, who had earlier agreed to support Conroy, viewed Conroy as the only choice for CEO since Farah was unacceptable to both him and the lenders. Tom Foster supported Conroy since Conroy was the one who State National wanted as CEO.

On March 23, the lenders met to discuss the position they would take at FMC's board meeting to be held later that day. Tom Foster's notes from the meeting reveal the following alternatives: (1) stop the board meeting if the lenders do not want Farah in; (2) get a new board with probable lender indemnification if the lenders want other management; and (3) allow Farah to have the position for 30–60 days after which the loan will be called. Other possible actions included: (1) making a public statement; (2) shrinking the board; and (3) going to New York to sell the company. His notes also reflect: (1) Farah is unac-

ceptable to lenders; (2) based on information received to date, there appears to have been a change in executive management and a material adverse change in the company, both of which are events of default enabling acceleration; (3) institute the plan to declare a default unless the following occurs: (a) an independent board is created with Farah preferably off, and (b) the lenders will make no commitment but will assist the board in finding outside directors (employees unacceptable); (4) lenders want a CEO reaffirmed or elected today; (5) issue a press release stating: (a) election of a new board, (b) a CEO is in place, and (c) Farah endorsed the changes; and (6) Farah should pursue a merger. Foster testified about various factors which he felt constituted a material adverse change. Donohoe differed with Foster's plans to convey to the board that a default would be declared under the management and material adverse change clauses in the event of Farah's election.

Also on March 23, the lenders then met with Azar, J. Farah, Conroy and others at Azar's own place of business in El Paso. Azar described Donohoe as the spokesman for the lender group and said Donohoe opened the meeting by saying that "Willie [Farah] was not acceptable as a chief executive officer and president." Azar said he told Donohoe that Farah was the only one who could turn the company around. When asked what else Donohoe had said, Azar responded, "[w]ell, it got to the point where if Willie Farah was elected president of the company, why, he would automatically bankrupt the company and he would padlock it the next day." Azar said that after talking to attorney Thomas on the phone he came back and told Donohoe that "he could take his loan agreement and shove it up his ass." Azar explained he did that "trying to determine how serious they were about bankrupting and closing the company, what was his intent. I intended to push him to the very brink and very edge and find out." Azar said Donohoe's response was "[w]e will." Azar said he then believed Donohoe would bankrupt and padlock the company if the board elected

Farah. He said as a result of the meeting, "I was fearful of putting the company in bankruptcy. So I agreed to talk to Mr. Farah and ask him to stand down and not stand for election." In regard to Azar's personal liability, although there was considerable testimony to the contrary, Azar testified Donohoe told him that he (Azar) would be personally liable as a director if he caused FMC's bankruptcy by electing Farah. There is evidence that Azar had access to and consulted with legal counsel during the meeting.

Also, at the Azar meeting, J. Farah criticized his father's views on management of FMC and indicated he could not support him for CEO, expressing emotional pressure and danger from the management change clause. There was also a discussion regarding the replacement of Leone as CEO, the unacceptability of Farah for that position and the desire of Conroy to acquire that office. In addition to his own vote, Conroy had J. Farah's support. Initially disagreeing with Conroy's capabilities, Azar reversed his position at the Azar meeting and decided to abandon his support of Farah. Azar also testified that the lenders never told him that they would not, in fact, bankrupt FMC if Farah were elected. Several of those in attendance at the Azar meeting testified that Donohoe did not make any statement regarding bankrupting and padlocking the company. Tom Foster admitted that Azar was not informed of the lenders' meeting of March 21 or any decision that a default would be declared only after Farah's election or that a default might never be declared.

Farah testified that he had Wood and Jaeger present before the board meeting later on March 23, expecting to have them elected to the Board. The same four lender representatives who were present at the meeting at Azar's place of business earlier were also nearby, including attorney Donohoe of Republic. Farah said that prior to the board meeting, Donohoe "started in" on him by telling him that he (Farah) had been a very incompetent person, had lost $37,000,000.00 and that he (Donohoe) was going to put the company into bankruptcy and padlock the doors the next morning. Farah testified Donohoe "pounded on the table right in front of me, right in my face there," and repeated the statement regarding bankrupting the company and padlocking the doors. Farah said he put the papers he was preparing for the meeting in his briefcase and left the room. Farah said he believed what Donohoe told him and "he (Donohoe) scared the devil out of me." Several witnesses testified that neither Donohoe nor any other of the lender representatives told Farah that FMC would be bankrupted or padlocked.

In accordance with his representation that he would talk to Farah, Azar met with Farah prior to the board meeting. Azar testified he told Farah that the lenders wanted Farah to resign as board chairman and to elect in his stead Gordon Foster (an employee of El Paso National Bank) and Conroy (a director of State National) as CEO. Azar asked Farah to stand down and told him of assurances by the lenders that they would bankrupt and padlock the company. Azar said he (Azar) believed there was no other way to save FMC and that the election of Gordon Foster and Conroy was the only way to prevent FMC's bankruptcy. Farah testified he believed what Azar and Donohoe had told him and that after talking to Azar, "I went to the board meeting, nominated Mr. Conroy to be chief executive officer and Mr. Gordon Foster to be Chairman."

Gordon Foster and Conroy were unanimously elected as nominated. Azar testified that his feelings for Conroy had not changed. Gordon Foster testified that in his opinion, in spite of reservations, Conroy was the only one available who could assume the position. The lenders agreed not to deem Conroy's election as an event of default.

There is evidence that Wood and Jaeger were not nominated nor elected at the board meeting due to the lenders' objection to their election. The lenders regarded them as Farah's personal employees and Tom Foster described them as Farah's

"puppets." The evidence shows that such an election was unacceptable to the lenders. There is no provision in the loan agreement regarding changes in the board. State National maintains that there is no evidence of any statement being made by a lender representative to a board member regarding the lenders' position on Wood and Jaeger. Gordon Foster testified that they were not elected due to opposition from other board members. Farah testified that it was the March 22 letter which kept him from nominating Wood and Jaeger. It is the State National's position that the election of the CEO depended upon the exercise by Farah of his voting power which Farah knew he had but which he failed to exercise. The minutes of the March 23 board meeting in evidence state in part:

Mr. Donohoe, representing Republic ..., came into the meeting along with Mr. Smith, representing the State National ... as well as Mr. Updike, Senior Vice President of The State National Bank. Mr. Donohoe indicated that the Banks objected to the nomination of Mr. Charles Wood and Mr. Richard Jaeger to the Board .... The Banks would be willing to discuss more positions with responsible individuals. The Banks wanted to be in a position to assure candidates that they could come on the Board without any substantial liabilities to themselves.

Attorney Smith of State National testified that he and Donohoe did not go into the boardroom. Smith did state the opinion, however, that the management change clause prohibited FMC from doing indirectly what it could not do directly (i.e. electing Wood and Jaeger in order to put Farah in control).

FMC cites to testimony and documentary evidence constituting admissions by the lenders of their complicity in the events of March 23. In this respect, notes prepared by Bettina Whyte reflect the insistence by Republic to remove Farah as board chairman and to choose a replacement for Leone acceptable to the lenders. Daugherty was cross-examined regarding an interview of Daugherty by the Texas Business Magazine indicating that State National was instrumental in selecting Conroy as FMC's CEO. Daughtery responded he was not sure he was quoted correctly and that perhaps "instrumental" was too strong a word. Also, a form letter received in evidence, without objection, as Plaintiff's Exhibit No. 138 was sent to from fifty to one hundred of FMC's customers by Houghton on State National letterhead. The letter dated April 18, 1977, states in part:

I am writing this letter to solicit your support of a thing very close to me personally, to the City of El Paso and I believe, to retail trade everywhere. I am sure you have read reams of material about Farah Manufacturing over the past year or more. The company recently went through a control struggle. The creditors, State National Bank of El Paso, Republic National of Dallas, and Continental Illinois of Chicago, blocked such a move because of a covenant in the loan agreement which prohibited change in the Chief Executive Officer without consent of the lender. The company has been through much turmoil and strife during the past six years; we felt this change would not help that situation. However, now, under the able leadership of William (Bill) Conroy, who held the office of Executive Vice President while I was with Farah, and who recently has been in charge of foreign operations, things will hopefully turn around....

After March 23, Farah pursued merger negotiations with Vanity Fair Corporation (VF). On March 24, the lenders met to discuss the FMC situation. By the end of the month, Tom Foster and other lender representatives had conducted numerous meetings and discussions with Gordon Foster and Conroy concerning FMC's financial condition, rumors of a new move by Farah to regain control and the new director candidates, Pulley, Jaynes and Williams. Bunten, Donohoe and Tom Foster spoke with Pulley regarding his candidacy. Pulley, a long-time employee of Republic, agreed to serve only if he were indemnified by Republic. Republic agreed and executed an

indemnity agreement. Continental and State National refused to participate in the proposed indemnity.

By April 1, Bettina Whyte's notes indicate that the "ship has stopped rocking" and the management situation was under control and that Pulley, Jaynes and Williams would be elected as directors. Although the evidence shows that Gordon Foster knew that they would be proposed as directors, neither Farah nor Azar knew that new directors would be elected on April 4. Farah and Azar further testified they were also unaware of who the candidates were until the day of the board meeting. Tom Foster admitted that, on April 4, there was no requirement that additional directors be elected to the board since the existing five directors were sufficient to conduct business.

Upon their arrival at the April 4 board meeting, Pulley, Donohoe and Tom Foster met with Williams, Jaynes, Gordon Foster and Conroy. Williams, a member of the State National Board, was recommended to the board by Conroy, also a member of the State National Board. Williams was elected. Azar cast the only dissenting vote on the basis of a conflict of interest arising from Williams' service on the State National Board. Jaynes, who was nominated by Azar, was elected unanimously. Close to both Farah and Gordon Foster, Jaynes was considered by Farah to be competent and independent.

After the election of Williams and Jaynes, J. Farah resigned from the board to permit the election of Pulley. Pulley was nominated by Farah to fill that vacancy. Azar dissented because of conflict of interest, Pulley's connections with Republic. By resolution, the board unanimously approved the proposed indemnity agreement. An executive committee with essentially the full power of the board was created and included Gordon Foster, Pulley, Williams and Conroy.

FMC emphasizes testimony regarding Pulley's continuing ties to Republic, his efforts for State National and his final approval for Republic's participation in the loan to FMC, and his close association with Tom Foster in other "workout" arrangements such as a Republic loan to another company, Jetco. In that instance Pulley had worked with both Donohoe and Tom Foster. The Jetco loan was made jointly with El Paso National Bank at a time when Jetco was encountering financial problems. El Paso National Bank was the successor trustee to Farah on the trust stock of Clifford and Virginia Farah. Young of El Paso National Bank had been involved in his bank's participation with Republic in the Jetco loan. He had given his approval, at the request of Republic, for Gordon Foster, an employee of his bank, to become chairman of FMC's board. Gordon Foster had dealings with Prudential and was a servicing officer for El Paso National Bank on loans to competitors of FMC. Conroy, a State National shareholder, had loans from State National.

After the April 4 meeting, FMC's board consisted of Farah, Azar, Conroy, Gordon Foster (chairman), Williams, Jaynes and Pulley. Although Farah testified that he voted for each of the new members so as not to cross Donohoe, there is evidence that Farah felt comfortable with the new board as being comprised of good businessmen. There is also evidence from FMC witnesses regarding the honor, dedication, ability and contributions of Conroy, Gordon Foster, Williams, Jaynes and Pulley and the fact that none of them breached any fiduciary duty or were dominated by the lenders. State National cites to testimony to support its position that none of the lenders had instructed the directors on how to vote for the director nominees on April 4.

According to FMC, the board became a five-to-two voting board with Farah and Azar in the minority on most occasions. According to State National, there is no evidence that, after March 23, 1977, any particular vote of any FMC director or any of FMC's daily decisions were dictated by the lenders.

The record shows that with FMC's financial condition still declining, while Conroy was CEO, the question of hiring Grisanti

and Galef arose. The consulting firm was known to both Continental and Republic. Tom Foster for Republic, acting as agent for the lenders, "respectfully requested" that FMC hire the firm in connection with a revision in the loan agreement. The revision was designed to eliminate existing defaults and to provide additional funds. Tom Foster admitted that there was nothing in the loan agreement which allowed the lenders to name consultants for FMC. On May 27, the board voted to hire Grisanti and Galef for $1,000.00 per day. Farah and Azar voted in favor of retaining the firm. Azar testified he viewed its employment as "pretty much a requirement" to continue or increase the loan. Galef accepted the consultant role.

From the evidence it appears that after concluding that Conroy could not save FMC, Galef proposed to the lenders in June that he replace Conroy as CEO. He indicated to them his plan to make sizeable loan prepayments during the next several months by selling company assets. The lenders approved of his becoming CEO. Galef presented his proposal to the board and expressed that he could have FMC "in the black in 90 days." Tom Foster admitted that Galef's projection for profitability never materialized. Galef also proposed that Farah be used as a consultant in manufacturing and management. At the July 30 board meeting, Galef was unanimously elected as CEO. Farah testified he supported Galef in order to save FMC from Conroy and because Galef had asked him (Farah) to serve as a consultant. Farah viewed this as the only way he could return to management. Azar testified he supported Galef because Galef had agreed to use Farah and because of the continued existence of the management change clause.

State National had expressed opposition to Farah as a consultant. Unable to determine whether Galef's election was adverse to their interests, the lenders did agree to waive the management change clause in favor of Galef's election. The consternation caused by Galef's suggestion to use Farah, according to Tom Foster, was re-ported to him by Gordon Foster. Once elected, Galef did not use Farah as a consultant.

State National cites to evidence reflecting that FMC's inventories, operations and operating costs were reduced during the several months while Conroy was CEO. Conroy testified that he had been required to take writedowns on inventory that Farah had previously committed the company to purchase. On the other hand, FMC maintains that the evidence shows Conroy was indecisive and inexperienced in merchandising, marketing, sales and manufacturing, and that although he had time to do so, Conroy failed to take any action to remedy problems in the 1977 fall line of products. FMC asserts the evidence shows Conroy maintained unnecessary and excessive administrative expenses and operating costs which included regional sales offices and international manufacturing facilities. FMC lost production contracts because it was unable to timely deliver quality goods. As Conroy continued to miss his budget and sales projections, FMC's sales and order rates continued to decline. Conroy resigned from the board on September 24, 1977.

FMC also maintains that the evidence shows Galef was inexperienced in the men's apparel business. Galef failed to make improvements in the 1977 fall line and was responsible for introducing the 1978 spring line which was too expensive, poorly priced and contrary to market demand. The spring line, although heavily advertised, received poor public response. As a result thereof, many orders were cancelled and excess inventory accumulated. With FMC losing much of its market to competitors by early 1978, Farah testified that Galef introduced the 1978 fall line with the dominant theme the same as that in the previously unsuccessful spring line.

FMC presented evidence showing that Galef expanded FMC's regional sales operations, increased costs of selling and advertising expenses, maintained high administrative costs and eliminated credit analysis

for new customers. He raised employees' salaries but fired or forced the resignation of many of FMC's top salesmen. FMC experienced delivery problems and a decline in manufacturing efficiency. Mill credit deteriorated and interest costs increased. Galef's efforts failed to have FMC meet his forecasts for sales and profits (losses). Orders were cancelled, sales declined and losses continued to increase.

While Galef was CEO, assets of FMC were sold at internationally publicized auctions. The net proceeds from the sales were used to make prepayments on FMC's loan. FMC points to the evidence that the auctions stripped it of valuable assets and that its competitors purchased much of the machinery and equipment for use in competition with FMC and that State National financed the purchase of certain auctioned assets by one of FMC's competitors. FMC presented evidence, as well, that Tom Foster selected the auctioneer, Irving Rosen, and made arrangements for the auction with him; that as a result of the auctions, employee morale suffered and FMC's customers lost confidence in its ability to produce and timely deliver quality goods. Farah and Azar had opposed the board's resolution for the auction of the itemized assets. It is State National's position that the machinery and equipment sold were in excess of FMC's operating needs. The lenders requested FMC to sell the assets pursuant to a promise made by FMC in June, 1976, that it would do so. Such promise had been an inducement for the lenders to make the loan.

It appears that after the April elections, Gordon Foster recognized a responsibility to stay on as board chairman so as to have a hand in choice of management. In May, the lenders noted that Farah was satisfactorily under control. They also noted that FMC would go into bankruptcy if management failed and that this would result in a derivative suit instituted by Farah for failure to represent the shareholders and for interference with management. There was evidence that if the bank loan were called and accelerated that would trigger the acceleration of Prudential's $10,000,000.00

loan as well as put FMC's $10,000,000.00 in debentures in default, resulting in a demand on FMC in excess of $40,000,000.00.

Evidence reveals that the lenders favored an FMC merger with VF Corporation since they felt that VF would relieve them of any liability for past occurrences. The lenders discussed among themselves a side agreement with VF, in fear that control of FMC would revert to Farah if VF failed to pursue its contemplated purchase of newly issued stock and its acquisition of a purchase option and the Farah family voting trust. The proposed agreement provided that the voted stock would be transferred to Jaynes, Pulley, Williams and Gordon Foster, as trustees, if VF were prevented from purchasing the stock or, if after its purchase, it failed to vote the stock for specified directors. It also provided that VF would transfer the option to the lenders if, within sixty days before expiration, it failed to exercise the option to purchase the Farah family stock in trust. Whyte of Continental testified that the banks had no legal claim against the Farah family stock. Tom Foster testified that Farah was not informed of the side agreement. The lenders met and discussed the matter with representatives of VF, however, the entire VF deal eventually died.

Farah filed a derivative suit to enjoin the November auction of FMC's fabric mill. The proceeds from the auction were intended for prepayment of the loan. Directors (G. Foster, Williams, Jaynes, Galef and Pulley) then filed a suit for damages against Farah. Farah's derivative suit was unsuccessful. He settled with the directors in the other litigation. He, as well as FMC, released the named directors from all liability on claims now asserted against State National. Although State National and Continental refused to participate, Republic agreed to pay for the directors' legal fees that Pulley submitted under his indemnity agreement.

On November 10, 1977, the board passed a resolution calling for Farah's resignation as a director. Although Farah and Azar

dissented, they both soon resigned. In January, 1978, Farah gave notice of a proxy fight that he was preparing in order to elect a slate of directors at the March board meeting whereby he could be reinstated as CEO. Clifford and Virginia Farah responded with a suit to remove Farah as trustee under the trust holding their stock. This was viewed by Farah as a measure to force his vote for the incumbent board. There is evidence that the lenders took an active interest to oppose Farah in his proxy fight and in his suit with Clifford and Virginia. Farah prevailed in the suit. This ultimately meant success for him in his proxy fight.

In January, 1978, FMC's financial condition was critical. At this time, the lenders determined that they were no longer willing to finance FMC's day-to-day operations although they did want to maintain some type of a long-term loan. FMC's short-term debts were soon to be due. Prior to Farah's return, the lenders had decided that the loan would be restructured whereby the management change clause would be deleted if: (1) FMC repaid the short-term debt by the middle of February, 1978; and (2) the long-term debt were substantially reduced and prepaid through third party accounts receivable financing. These conditions were met and the way was paved for Farah's return as CEO. The restructuring document originally contained a release for lender liability. When discovered by FMC, it was deleted.

In April, 1978, FMC's financial condition was desperate. Ray Williams (not the same Director Williams previously mentioned), FMC's president at the time of trial, testified that FMC was close to bankruptcy without official declaration of the act. As there was a deficiency in FMC's ready cash for payment of day-to-day operations, many expenses went unpaid. The company had a liquidity deficit exceeding $1,000,000.00 since an overdraw, approximating $1,500,000.00 on the new accounts receivable loan arranged by Galef, had been prepaid to the lenders. Under the newly amended loan agreement, FMC was required to make four consecutive monthly payments, each in the amount of $250,-000.00. Sales were down. Expenses were high. The company was selling the wrong products which were also underpriced. There were delivery problems. There was no credit from suppliers. Customer credit restrictions were relaxed and customer relationships had deteriorated. The physical plant was in disrepair and employee morale was low.

Damage testimony regarding actual losses and lost profits primarily came from Killman, a certified public accountant. His calculations were based on an extensive examination of FMC's internal documents and financial statements. He testified FMC's operating loss for the period April 1, 1977, through March 31, 1978, during the leadership of Conroy and Galef, totalled $10,162,000.00. The jury found $2,668,-500.00. To determine lost profits Killman used the "trend line methodology." In making the initial calculations, he eliminated the 1972–1974 strike boycott period as being an extraordinary circumstance. To meet a defense objection to this elimination, he recalculated and included the deleted period. He used FMC's actual sales for a base period, first 1959 through 1971, and next 1959 through 1975. He calculated the average sales trend for the indicated years. The trend of increasing sales was then applied to the damage period for a projection of the sales therein. FMC's average profit rate of 10.9 percent of sales for the base period was then applied to projected sales in order to project profits. To arrive at lost profits, projected profits were compared with the actual results. His first lost profit figure (based on 1959–1971) was $51,232,000.00 for the four-year, seven-month damage period. His second lost profit figure (based on 1959–1975) was $24,377,000.00 for the damage period. The jury found $15,482,000.00, well within either of the figures thus dually calculated.

Auction damages were principally evidenced by the testimony of auctioneer Rosen and appraiser expert Kitson and will be further treated under the discussion of Appellant's point attacking the jury's verdict.

Killman, previously mentioned, testified as well regarding the lost profits from auction sales. The jury finding of $75,000.00 was substantially below Killman's testimony of $308,000.00 as to this element. His calculation was based on the interest effects of the lower proceeds from such sales, based on the assumption that FMC would have applied the greater amount it claims should have been received to reduce the loan thus reducing the interest required to be paid. Also as to damages, Ray Williams (FMC President at time of trial) testified to the effect of lost capital on sales and profits. Dow, FMC's machine shop manager, testified to damage to FMC due to auction sales and effect on subsequent operations.

Witnesses associated with a major supplier, a retailer (Macy's), as well as a competitor of FMC, each testified as to FMC's condition at the time of Farah's return. Testimony from the supplier reflects that FMC was then selling the wrong products. The retailer testified that FMC couldn't compete with its major competitors since it did not have a viable line of products. It had become an item supplier of selected garments used to fill a line rather than a line supplier of a substantial number of products. A former Levi Straus executive testified that his company felt FMC would disappear from the market as a competitor.

By March 25, 1978, Williams, Jaynes and Gordon Foster had resigned from the board. Pulley and Galef continued to serve on the new board until Pulley's resignation on or about April 7, 1978, and Galef's resignation on April 12, 1978. On April 4, 1978, the FMC board approved the restructured loan agreement. Although FMC failed to make several payments that were due in the spring of 1978, those payments were made in July. By July of 1979, FMC had refinanced and then repaid the loan in full.

FMC cites to considerable testimony regarding Farah's abilities and the high regard in which he is now held by others in the apparel industry for his success in turning FMC around after his return. After his return, he reduced selling and administrative costs, disposed of unusable inventory to generate working capital, expanded international sales and regenerated employee, supplier and retailer confidence in FMC and its products. Since Farah's return to management, FMC has consistently experienced an increase in sales and profits and has regained its position as an effective competitor with other manufacturers of apparel.

State National, by Points of Error Nos. One through Three, challenges the legal and factual sufficiency of the evidence to support the jury's finding of fraud in special issue Question No. 1A. Point of Error No. One states that there is no evidence to support the finding. In Point of Error No. Two, State National alleges that the trial court erroneously rendered judgment on such finding because as a matter of law FMC does not have an actionable claim for fraud. Point of Error No. Three states that the evidence is factually insufficient to support the finding.

FMC's cause of action for fraud focuses upon the March 22 letter and the statements made by Donohoe to Farah and other board members on March 23 of bankruptcy and padlocking if Farah were elected as CEO. The evidence is legally and factually sufficient, albeit conflicting, that on March 21 the lenders had either decided not to declare a default which would result in FMC's bankruptcy or reached no decision on the matter. Neither position was conveyed to the board. Regardless of the position taken, the "warnings" (representations) made in the letter and by Donohoe are characterized by FMC as false threats constituting fraud.

■ Fraud may be effected by a misrepresentation. As such, it was held in *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas*, 516 S.W.2d 138, 142, 143 (Tex.1974);

A representation consists of words or other conduct manifesting to another the existence of a fact, *including a state of mind.* It may be made directly to the other or by a manifestation to third persons intended to reach the other. A misrepresentation is a representation which,

under the circumstances, amounts to an assertion not in accordance with the facts.

. . . . .

[T]o constitute actionable fraud it must appear: (1) That a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury. *The gist of an action based upon fraud is found in the fraud of defendant and damage to plaintiff.* (Emphasis added).

■ A representation literally true is actionable if used to create an impression substantially false. *Blanton v. Sherman Compress Co.*, 256 S.W.2d 884 (Tex.Civ. App.—Dallas 1953, no writ). A false representation may consist of a deceptive answer or any other indirect but misleading language. *North America Life Insurance Company v. Wilburn*, 392 S.W.2d 364 (Tex.Civ.App.—Dallas 1965, no writ).

Tom Foster admitted that, although the interpretation of the March 22 letter was left to the board, the letter could have created an impression that there would be a default if Farah were elected as CEO. The letter's author, attorney Donohoe, made the same admission. The Restatement (Second) of Torts sec. 527 (1977) states:

A representation that a maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made:

(a) with the intention that it be understood in the sense in which it is false, or

(b) without any belief or expectation as to how it will be understood, or

(c) with reckless indifference as to how it will be understood.

FMC maintains that the lenders were required to exercise good faith in their representations made to FMC on March 22

and 23. Smith (Attorney for State National) admitted that the parties to the loan agreement were legally obligated to deal in good faith with one another. In regard to good faith, the Texas Business and Commerce Code (Vernon 1968) provides:

Sec. 1.203. Every contract or duty within this title implies an obligation of good faith in its performance or enforcement. Sec. 1.201(19). "Good faith" means honesty in fact in the conduct or transaction concerned.

■ FMC also maintains that once the lenders voluntarily conveyed information which was false or misleading (the March 22 letter and the representations attributed to Donohoe) and which would influence Farah and other board members, then the lenders were under a duty to disclose the whole truth regarding any decision on default. Where there exists such a duty of disclosure, a deliberate suppression of material facts constitutes fraud. *Wilson v. Jones*, 45 S.W.2d 572 (Tex.Comm'n App. 1932, holding approved). See also: Restatement (Second) of Torts secs. 529, 551(2)(b) and Comment (g) (1977).

Despite the foregoing arguments and authorities advanced by FMC, State National asserts a two-fold position upon which it maintains that there is no legal basis for an actionable claim of fraud. First, it maintains that fraud cannot arise from a warning of an intention to enforce legal rights. It argues that the issue is not whether the lenders had yet to commit to do what they had warned. Rather, the issue is whether they had a legal right to do it.

State National cites to no cases directly supporting this position. It cannot overcome the legal and factual sufficiency of the evidence that the lenders made false material representations which they knew to be false and which, as intended, were relied and acted upon by Farah and other board members. The representations that a default would be declared and the company bankrupted and padlocked if Farah were elected as CEO concern a material fact and amount to more than a mere opinion, judgment, probability or expectation on the part

of the lenders. See: *Trenholm v. Ratcliff,* 646 S.W.2d 927 (Tex.1983). Compare: *Hicks v. Wright,* 564 S.W.2d 785 (Tex.Civ. App.—Tyler 1978, writ ref'd n.r.e.). The March 22 letter and representations created a false impression regarding the lenders' decision (or lack of decision) to declare a default.

In the second aspect of this position, State National maintains that fraud cannot arise from a misrepresentation of future performance unless performance of the act is beneficial to the promisee and the promisee is injured by its nonperformance. Simply put, the injury must arise from the nonperformance of the act rather than the mere representation that the act will occur. A number of "false promise" cases are cited which allegedly establish the basis for actionable fraud arising from a false promise. The premise in these cases is asserted to be a promise followed by an injury which results from the nonperformance of what was promised. Thus, there was a transaction in which the plaintiff would have been "better off" had the defendant done what he promised he would do. This element is argued to be absent in FMC's claim of fraud.

■ State National's reasoning is unsound. The cited cases deal with promises which, when made, may have been intended to be performed but which were later unperformed. The causes of action arose from breaches of the promised acts. However, the basic element of actionable fraud is a material representation which, when made, is known by the speaker to be false and which results in damage to another. *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas,* supra.

This Court in *Southwestern Bell Telephone Co. v. Meader Construction Co.,* 574 S.W.2d 839, 842 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.) stated a rule directly in conflict with the argument raised by State National. It held:

> [S]ince the state of mind of a person making a representation is a fact, it is susceptible of being misrepresented and thus can become the basis of a suit for fraudulent representation. Where *a promise regarding future action is made with the intent that it will not be performed and is made to deceive a person,* then it *is actionable as a fraudulent representation.* (Emphasis added).

See: Restatement (Second) of Torts sec. 530(1) (1977).

In *Trenholm v. Ratcliff,* supra, the speaker, having special knowledge of the facts, made a representation regarding the occurrence and existence of such facts in the future. At the time of the representation, the speaker had no actual control over their occurrence or existence in the future. Thus, the representation was recklessly made. The court held at 931:

> These are direct representations of present facts which are so intertwined with his future prediction that the whole statement amounts to a representation of facts. A jury finding of recklessness is sufficient to establish a basis for misrepresentation of facts.

■ FMC is entitled to a claim of fraud for injuries arising from a promise which was not intended to be performed as opposed to a promise which may have been intended to be performed but which was later unperformed. As previously stated, the representations made amounted to more than a mere opinion, judgment, probability or expectation on the part of the lenders.

■ If a representation is one to do a future act, the intention not to perform that act may be proven by circumstances. *Ryan Mortgage Investors v. Berton Land Development Corporation,* 586 S.W.2d 887 (Tex.Civ.App.—Beaumont 1978, no writ). Accord: *Isenhower v. Bell,* 365 S.W.2d 354 (Tex.1963).

■ As a matter of law, FMC has established a cause of action for fraud. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. One through Three are overruled.

Points of Error Nos. Four through Six raise issue with the legal and factual sufficiency of the evidence to support the jury's finding of duress in special issue Question No. 1B. Point of Error No. Four states that there is no evidence to support the finding. In Point of Error No. Five, it is asserted that the trial court erroneously rendered judgment on such finding because as a matter of law FMC does not have an actionable claim for duress. Point of Error No. Six states that the evidence is factually insufficient to support the finding.

FMC's cause of action for duress focuses upon the March 22 letter, the statements made by Donohoe to Farah and other board members on March 23, and the lenders preventing the election of Wood and Jaeger as directors. The most difficult question posed by State National is whether as a matter of law FMC has established a cause of action for duress whereby it may recover damages.

State National advances five reasons why FMC has no legal basis for an actionable claim of duress. First, it asserts that FMC undertook no new obligation to any lender under duress. In this regard, it is asserted none of the lenders received any undue or unjust benefit that can or should be recovered by FMC.

 One authority is cited for support of the traditional view that duress is not fraud nor is it, in and of itself, a recognizable tort. However, it is now generally recognized that the remedy for duress is one which is restitutionary in nature whereby the victim seeks either to be relieved from the obligation he assumed under duress or to recover the value of that which he delivered (damages). D. Dobbs, Remedies sec. 10.2 (1973). As to the damages aspect of the remedy, see: e.g., *Sanders v. Republic National Bank of Dallas*, 389 S.W.2d 551 (Tex.Civ.App.—Tyler 1965, no writ). See generally: 13 Williston on Contracts sec. 1627B (3d ed. 1970); Restatement of Restitution sec. 71 (1937).

In the only Texas case found to address the point, it was held that duress is a tort. *Housing Authority of City of Dallas v.*

*Hubbell*, 325 S.W.2d 880, 902 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.). There, the court stated:

> [Duress] often arises in connection with breach of contract, but it is nevertheless a tort, .... One who sustains damage as a result of being subjected to duress may sue as plaintiff against the wrongdoers. "Economic coercion", the basis of Lewis' cause of action, is generally considered a form of duress.

In *Housing Authority*, the plaintiff had sought lost profits as a portion of the damages sustained as a result of his being subjected to duress. The jury's finding of damages did not include lost profits. Although the appellate court reversed the judgment awarding damages upon other grounds for recovery, it affirmed that portion of the judgment awarding damages for duress. There was no specific holding upon the plaintiff's right to recover lost profits as damages for duress. The issue of whether FMC is entitled to lost profits will be discussed later.

 As noted in *Reaugh v. McCollum Exploration Co.*, 139 Tex. 485, 163 S.W.2d 620, 621 (1942):

> The fundamental purpose underlying all rules of damages, other than punitive damages, is to indemnify the injured party for the pecuniary loss suffered by him, placing him as nearly as possible in the position that he would have occupied but for the injury in question.

Pecuniary compensation may be had for an injury done or wrong sustained as a consequence of either a breach of a contractual obligation or a tortious act. *H.L. McRae v. Lindale Independent School District*, 450 S.W.2d 118 (Tex.Civ.App.—Tyler 1970, writ ref'd n.r.e.).

As to those arguments that FMC undertook no new obligation to any lender under duress and that none of the lenders received any undue or unjust benefit that can or should be recovered by FMC, a better understanding of them can be had by first undertaking a discussion of the next two reasons advanced by State National for

maintaining that there is no legal basis for an actionable claim of duress.

The second and third reasons advanced by State National are discussed together. The second reason states that there is no duress from warnings about enforcing or about the consequences of enforcing contractual rights. The third states that there is no duress when there is no imminent harm or when adequate means of protection are available from the courts.

*Dale v. Simon*, 267 S.W. 467, 470 (Tex. Comm'n App.1924, judgmt adopted) is the leading case as to the elements of and the limitations upon a cause of action for duress. It was there held:

> There can be no duress unless [1] there is a threat to do some act which the party threatening has no legal right to do. [2] Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. [3] The restraint caused by such threat must be imminent. [4] It must be such that the person to whom it is directed has no present means of protection.

Further elements stated are in regard to the availability of the courts to the threatening party in the enforcement of his legal right:

> ■ Where a demand made is wrongful or unlawful, and it is necessary for the party making such demand to resort to the courts to enforce same, there is no duress, for the one upon whom demand is made has adequate means of protection, and there is no imminent restraint ....
> ■ But where the party making such demand has, or is supposed to have, the power to injure the business or property interests of the one upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces a compliance with his demand, [7] against the will of such party through fear of injury to his business or property interests, such threats amount to duress, [8] if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof.

It has been held that threatening to do that which a party has a legal right to do cannot form the basis of a claim of duress by business compulsion. The vice arises only when he employs extortive measures, or when, lacking good faith, he makes improper demands. *Sanders v. Republic National Bank of Dallas*, supra (recovery on a promissory note for "interim" rent allegedly executed in response to a threat to cancel a contract of sale on property from the promisee to the promisor). It was also held in that case that the contract of sale provided for the payment of rent, that the promisee voluntarily executed the promissory note with full knowledge of all facts and without duress, and that the benefit of rental payment accruing to the promisee by the contract of sale supplied the consideration for the execution of the promissory note in payment thereof. *Sanders v. Republic National Bank of Dallas*, supra, at 554, 555. In another case it was held that devices applied by a party are not coercive when they are foreseeable ramifications of a breakdown in the performance of the threatened party's contractual obligations. *Eggleston v. Humble Pipe Line Company*, 482 S.W.2d 909 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.).

For a detailed analysis of the law and related cases on the threatening party's resort to courts, see: *Ward v. Scarborough*, 236 S.W. 434 (Tex.Comm'n App.1922, judgmt adopted). Of particular note therein is the cited case of *Harris v. Cary*, 112 Va. 362, 71 S.E. 551 (1911).

FMC's position relies upon the lenders' warnings to declare a default (and to accelerate payment of the loan) having been undertaken in bad faith. It cites to Section 1.208 of the Texas Business and Commerce Code (Vernon 1968) which provides, in pertinent part:

A term providing that one party ... may accelerate payment or performance ... "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired.

■ Even where an insecurity clause is drafted in the broadest possible terms, the primary question is whether the creditor's attempt to accelerate stemmed from a reasonable, good-faith belief that its security was about to become impaired. *Sheppard Federal Credit Union v. Palmer*, 408 F.2d 1369 (5th Cir.1969). Acceleration clauses are not to be used offensively such as for the commercial advantage of the creditor. They do not permit acceleration when the facts make its use unjust or oppressive. *Brown v. Avemco Investment Corporation*; 603 F.2d 1367 (9th Cir.1979), citing *Vaughan v. Crown Plumbing & Sewer Service, Incorporated*, 523 S.W.2d 72 (Tex. Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.), and *Bischoff v. Rearick*, 232 S.W.2d 174 (Tex.Civ.App.—El Paso 1950, writ ref'd n.r.e.). The court in *Brown* also held that Section 1.208 applies to clauses which provide for acceleration at the option of the creditor (at page 1378), and to "default" acceleration clauses (at page 1380).

State National relies upon the holdings in three cases wherein the courts were said to have upheld the enforcement of either optional acceleration or due-on-sale clauses. In *Sonny Arnold, Inc. v. Sentry Savings Association*, 633 S.W.2d 811, 816 (Tex. 1982), the court was merely called upon to decide whether an optional acceleration clause, as executed, was valid and enforceable but in that case there was no allegation that there was anything wrongful or improper in the manner in which the clause was enforced. In *Crestview, Ltd. v. Foremost Insurance Company*, 621 S.W.2d 816, 820, 823 (Tex.Civ.App.—Austin 1981, writ ref'd n.r.e.), the alleged wrongdoer was found not to have enforced the due-on-sale clause in an unreasonable, inequitable, unjust or oppressive manner. However,

the court noted that the issue regarding such conduct is to be determined by the facts of the case. In *Casey v. Business Men's Assurance Company of America*, 706 F.2d 559 (5th Cir.1983), the alleged wrongdoer acted within the precise rights conferred upon him in a due-on-sale clause. As all of the above-cited cases are factually distinguishable, they do not control the disposition of the duress issue herein.

■ In *Vaughan v. Crown Plumbing & Sewer Service, Incorporated*, supra, at 76, equity permitted consideration of the great disparity between the holder's loss of use of an overdue installment and the hardship which would result to the owner of the property if immediate foreclosure were permitted. Further, exercise of an optional right of acceleration, not for the purpose of protecting the debt or preserving the security, but for the purpose of coercing the maker to pay the entire debt or forfeit his property, was relevant to the equitable considerations to be made. Duress may be evidenced when a threatening party acts oppressively to further his own economic interests. *Brown v. Avemco Investment Corporation*, supra; *Mitchell v. C.C. Sanitation Company, Inc.*, 430 S.W.2d 933 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.).

The question of duress frequently turns on the motive upon which a claim is based. 13 Williston on Contracts sec. 1607 (3d ed. 1970). According to the Restatement (Second) of Contracts sec. 176 (1981):

(1) A threat is improper if

. . . . .

(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

(2) A threat is improper if the resulting exchange is not on fair terms, and

(a) the threatened act would harm the recipient and would not significantly benefit the party making the threat,

... or

(c) what is threatened is otherwise a use of power for illegitimate ends.

■ Economic duress (business coercion) may be evidenced by forcing a victim to choose between distasteful and costly situations, i.e., bow to duress or face bankruptcy, loss of credit rating, or loss of profits from a venture. 13 Williston on Contracts sec. 1617 (3d ed. 1970), citing *Housing Authority of City of Dallas v. Hubbell,* supra.

There is evidence that the loan to FMC was not in default at the time the warnings were given by the lenders on March 22 and 23. There was then no impaired prospect of repayment but for the perpetuation of FMC's alleged poor financial condition or perhaps for the possibility of Farah's election as CEO (in view of his past performance). Admittedly, his election could have constituted a default under the management change clause thereby enabling the lenders to legitimately enforce their legal rights.

However, there was no circumstance to authorize the manner in which the warnings to declare default were made. This is particularly true when given the evidence that the lenders previously had either decided not to declare a default which would result in FMC's bankruptcy or reached no decision on the matter. For an analagous situation, see: *Leeper v. Beltrami,* 53 Cal.2d 195, 1 Cal.Rptr. 12, 19, 347 P.2d 12, 19 (1959). That was a suit to recover money paid upon a threat to foreclose on a mortgage which the defendants knew to have been already satisfied. The court held that the defendants, in making such threats, knew that the asserted claim was false. Such constituted duress.

FMC did undertake a new obligation to the lenders under duress. By virtue of the warnings made on March 22 and 23, it became specifically and absolutely obligated not to have Farah elected as CEO. Under the management change clause, however, Farah could have been elected. The board had been under no obligation to see that such *would not* occur. In the "event" that it did, then it was the legitimate option of the lenders to determine whether or not it should be viewed as a default. Instead,

they chose to issue warnings designed to *force the board to elect someone other than* Farah.

It is argued that the management change clause was approved by the entire FMC board with the clear understanding that the clause could be used to resist an effort by Farah to return as CEO. It is true that use of the management change clause had been perceived by the board in context with the legitimate options available to the lenders. However, the evidence reflects that there was no anticipation of the manner in which it was ultimately used.

The lenders accrued an unjust benefit merely by their efforts to insure that FMC would be managed by those who had been "previously approved." They had the power to injure the business and property interests of FMC upon the issuance of their warnings. The evidence is sufficient that injury was sustained by virtue of the lenders' pressure to have Conroy and others manage FMC and to have Farah excluded from active management.

■ As admitted by the lenders, legitimate options were at their disposal. Such options, however, were not pursued. The very nature of their warnings constitutes duress. It caused Farah and other board members to do what they would not have otherwise done. That Donohoe threatened to bankrupt and padlock FMC the next day, the threat was made imminent. It gave Farah and others the impression that the only way to save FMC was to submit to the lenders' demand that Farah not be elected. Their legal right to declare default could have been achieved without resort to the courts. Thus, the evidence establishes that the elements of an actionable claim of duress have been met. *Dale v. Simon,* supra. State National's first three reasons for FMC's nonentitlement to a cause of action for duress are without merit.

Its fourth reason states that FMC's claim of vulnerability to duress cannot be based upon pre-existing financial difficulties for which FMC was responsible. FMC does not contend that the lenders were responsible for its financial condition or situation

prior to the time they issued their warnings. However, FMC does maintain that at the time the warnings were made the loan was not in default. Thus, the duress could not have resulted from an existing financial condition. Rather, it turned on the threat of default and imminent bankruptcy and padlocking. There is evidence to support this position.

State National relies heavily upon the case of *First Texas Savings Association of Dallas v. Dicker Center, Inc.*, 631 S.W.2d 179, 185 (Tex.App.—Tyler 1982, no writ), and cases cited therein, for support of its position. In *First Texas*, the court stated:

> It seems to be a settled principle of law that economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress.... A charge of economic duress or business compulsion *must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or in his fear of what a third person might do* ....

In *First Texas*, the plaintiff was concerned about his inability to cope with his poor financial condition existing prior to the time of the alleged duress. There, as here, no contention was made that the defendant was responsible for the plaintiff's financial condition. The plaintiff in *First Texas* testified that he succumbed to the defendant's alleged duress and threat to keep a $40,000.00 CD (a good faith deposit by plaintiff to secure an allegedly breached $2,000,000.00 loan commitment from defendant), but that he did so because he needed funds. Not only did the court find that the defendant had a legal right to retain the good faith deposit, it also found that the plaintiff's pressing need for the $40,000.00 was unsupported by the evidence. It held that there was no duress since the plaintiff's claim was based entirely upon his financial distress for which he was responsible.

The *First Texas* case and those like it are clearly distinguishable. FMC's claim of duress does not rest upon its pre-existing financial condition as the basis for Farah and other board members having submitted to the lenders' threats. It rests primarily upon the acts and conduct of the lenders and the ramifications carried by their threats. Since FMC's pre-existing financial condition is not relevant to its cause of action for duress, State National's fourth reason is without merit.

Its fifth reason states that the opinions expressed by the lenders as to indirect changes in management, or as to the personal liability of the directors (Azar) for FMC's bankruptcy upon default, do not constitute duress. The first matter involves Farah's attempt to have Wood and Jaeger elected to the board. Tom Foster admitted that the loan agreement did not pertain to the election of directors. There is evidence that the lenders viewed Wood and Jaeger as personal employees of Farah and that Tom Foster viewed them as Farah's "puppets" and that the lenders viewed the management change clause as prohibiting the election of Wood and Jaeger to enable Farah to indirectly control FMC. There is sufficient evidence that the election of Wood and Jaeger was prevented by the lenders' objection thereto. The cases cited by State National do not directly support its position on the matter. Duress was effected to prevent the election of Wood and Jaeger as were the warnings made in regard to default and bankruptcy.

Although there is no merit to State National's position on the preceding matter, there is merit to its position regarding the statement made to Azar that he would be personally liable as a director if he caused FMC's bankruptcy by electing Farah. There is evidence that the statement was not made by the lenders. Even if it had been made, it was an expression of a legal opinion. Azar had access to legal counsel with whom he conferred on the matter. Thus, the statement could not constitute duress. *Dial Temp Air Conditioning Company v. Faulhaber*, 340 S.W.2d 82 (Tex.Civ.App.—Dallas 1960, writ ref'd n.r. e.). Despite such a holding, there remains

sufficient evidence of other acts constituting duress.

As a matter of law, FMC has established a cause of action for duress. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Four through Six are overruled.

Points of Error Nos. Seven through Nine challenge the legal and factual sufficiency of the evidence to support the jury's finding of interference in special issue Question No. 1C. Point of Error No. Seven states that there is no evidence to support the finding. It is alleged in Point of Error No. Eight that the trial court erroneously rendered judgment on such finding because as a matter of law FMC does not have an actionable claim for interference. Point of Error No. Nine states that the evidence is factually insufficient to support the finding.

Appellee's position in regard to interference centers on this, that the lenders went well beyond their March 22, 1977 letter. Appellee asserts that after Azar's vote was reversed and Farah was neutralized, the lenders continued to interfere with FMC's rights to lawful management and proper corporate governance by installing Conroy as CEO, forcing Farah's resignation and substituting Gordon Foster as chairman. Appellee further asserts that the evidence shows the lenders prevented the election of Wood and Jaeger to the board, caused J. Farah to resign and packed the board with hand-picked nominees; that they first installed Galef as a consultant and later as CEO; and encouraged and financially supported costly litigation and a proxy fight against Farah when he sought to restore lawful management to the company. Appellee urges that the evidence shows that the lenders' acts of interference were patent, continuing and without justification.

Three reasons are asserted by State National in support of its position that FMC has no legal basis for an actionable claim of interference. The first reason states that the lenders were legally justified and privileged to issue warnings based upon the exercise of contractual rights or upon a financial interest. The second states that there is no evidence showing an intent by the lenders to harm FMC.

■ Interference with another's business relations with a third party is actionable only if the interference is motivated by malice and no useful purpose of the inducing party is subserved. *Morris v. Jordan Financial Corporation*, 564 S.W.2d 180 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r. e.). In *Davis v. Lewis*, 487 S.W.2d 411, 414 (Tex.Civ.App.—Amarillo 1972, no writ), it was conversely held:

[O]ne may lawfully induce another to refrain from having business relations with a third person, although it injuriously affects such third person, provided his action be to some legitimate interest of his own, and no definite legal rights, such as contract rights, are thereby violated.... Further, one who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor does not employ improper means and acts to protect his interest from being prejudiced by his relations.

■ One is privileged to interfere with a contract between others when he does so in the bona fide exercise of his own rights or when he possesses an equal or superior interest to that of the plaintiff in the subject matter. *Black Lake Pipe Line Company v. Union Construction Company, Inc.*, 538 S.W.2d 80 (Tex.1976); *White v. Larson*, 586 S.W.2d 212 (Tex.Civ.App.—El Paso 1979, no writ); *Morris v. Jordan Financial Corporation*, supra.

■ In *Davis v. Lewis*, supra, the court concluded that business relations interference is actionable only if both malice *and* illegal action combine to produce an injury. Malice, in this connection, is not to be understood in its proper sense of ill will against a person, but in its legal sense, as characterizing an unlawful act, done intentionally without just cause or excuse. *Light v. Transport Insurance Company*, 469 S.W.2d 433 (Tex.Civ.App.—Tyler 1971,

writ ref'd n.r.e.). See: *White v. Larson,* supra. In this perspective, that malice constitutes an intentional and unlawful interference, then that is all that must be proven to establish a cause of action to recover actual damages. Actual malice (ill will, spite, evil motive, or purposing the injury of another) need not exist. *Clements v. Withers,* 437 S.W.2d 818 (Tex.1969); *Herider Farms-El Paso, Inc. v. Criswell,* 519 S.W.2d 473 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.).

■■■ In *Armendariz v. Mora,* 553 S.W.2d 400, 404 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.), this Court held:

> To maintain the action for interference with the contract, it must be established that (1) there was a contract subject to interference, (2) the act of interference was wilful and intentional, (3) such intentional act was a proximate cause of Plaintiff's damage, and (4) actual damage or loss occurred.

The proof of these elements establishes a prima facie case of interference. It then becomes incumbent upon the part of the defendant to show that his acts were either justified or privileged. *Armendariz v. Mora,* supra. See: *Herider Farms-El Paso, Inc. v. Criswell,* supra. But see: *White v. Larson,* supra. In all cases, the act of interference must be without legal right or justifiable cause on the part of the defendant. *White v. Larson,* supra; *Herider Farms-El Paso, Inc. v. Criswell,* supra.

■■■ Interference embraces within its scope all intentional invasions of contractual relations, including any act injuring or destroying property and so interfering with the performance of the contract itself, regardless of whether breach of contract is induced. It presupposes knowledge of the plaintiff's interests or, at least, of facts that would lead a reasonable man to believe in their existence. *Tippett v. Hart,* 497 S.W.2d 606 (Tex.Civ.App.—Amarillo), writ ref'd n.r.e. per curiam, 501 S.W.2d 874 (1973).

According to the court in *Light v. Transport Insurance Company,* supra, at 439, interference is wrongful:

> [I]f acts complained of do not rest on some legitimate interest *or* if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated .... (Emphasis added).

See: *Leonard Duckworth, Inc. v. Michael L. Field & Company,* 516 F.2d 952 (5th Cir.1975), citing to *Light* in application of Texas law. Compare: *International Bank of Commerce of Laredo v. Union National Bank of Laredo,* 653 S.W.2d 539 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.), wherein there was no evidence that the alleged wrongdoer had acted under anything other than a good faith belief that it could exercise certain rights.

■■■ A justifiable business interest does not grant absolute privilege to interfere with a contractual relationship between others. *Frank Coulson, Inc.-Buick v. General Motors Corporation,* 488 F.2d 202, 206, (5th Cir.1974). In determining the propriety of interference, the court in *Coulson* noted that various factors must be weighed. It stated:

> Various important factors have been identified, however, which relate to an appraisal of the private interests of the parties involved as well as to a consideration of the social utility of these private interests. The principal issue thus becomes whether the social benefits derived in permitting acts of intervention outweigh the harm to be expected therefrom.

The jury was instructed in the case now before us as follows:

> [A]ny intentional invasion of, or interference with, property or property rights, causing injury without just cause or excuse, constitutes "interference." It must be shown that the conduct was willful and intentional and actual malice need not be shown.

Arguably, the instruction misplaced the burden of proof by requiring FMC to show that acts of interference were without just

cause or excuse. *Armendariz v. Mora,* supra. Yet, it properly eliminated "actual malice" as an element to be proved for recovery. *Clements v. Withers,* supra. Interference requires only that acts be done willfully and intentionally. This does not require that the acts be shown to have been undertaken with an intent to harm. *Armendariz v. Mora,* supra.

 Regardless of the manner in which the burden of proof was placed, FMC proved a prima facie case of interference by legally sufficient evidence. There is also legally sufficient evidence that acts of interference were undertaken without just cause or excuse.

As its third reason asserted to support the proposition that FMC has no legal basis for an actionable claim of interference, State National argues that there is no evidence of interference with an existing or reasonably probable future contract or business relation. Admittedly, actionable interference has traditionally been found to fall within one of these two categories. See generally: *Davis v. Lewis,* supra, and other cases cited herein.

The central theme of FMC's case is that the lenders interfered with FMC's own business relations and protected rights. Although the lenders may have been acting to exercise legitimate legal rights or to protect justifiable business interests, their conduct failed to comport with the standards of fair play. *Light v. Transport Insurance Company,* supra; *Leonard Duckworth, Inc. v. Michael L. Field & Company,* supra. Upon consideration of the private interests of the parties and of the social utility thereof, the social benefits derived from permitting the lenders' interference are clearly outweighed by the harm to be expected therefrom. *Frank Coulson, Inc.-Buick v. General Motors Corporation,* supra.

 In view of the foregoing principles, the evidence is legally sufficient that the lenders interfered with FMC's business relations, its election of directors and officers and its protected rights. FMC was entitled to have its affairs managed by competent directors and officers who would maintain a high degree of undivided loyalty to the company. See: *International Bankers Life Insurance Company v. Holloway,* 368 S.W.2d 567 (Tex.1963); *Canion v. Texas Cycle Supply, Inc.,* 537 S.W.2d 510 (Tex. Civ.App.—Austin 1976, writ ref'd n.r.e.). State National cites to a case involving a suit for the breach by a director of his fiduciary duty to properly manage a company. *Meyers v. Moody,* 693 F.2d 1196, 1211 (5th Cir.1982) cert. denied —— U.S. ——, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). There, the court approved an instruction to the jury that directors "are not responsible for ordinary mistakes of business judgment." If State National is relying upon such a principle to diminish its own liability for actions undertaken by FMC's directors, it should have submitted an appropriate instruction. However, it failed to do so.

The evidence is factually sufficient that the interference compelled the election of directors and officers whose particular business judgment and inexperience and whose divided loyalty proximately resulted in injury to FMC. The interference by the lenders was done willfully, intentionally and without just cause or excuse. As a matter of law, FMC has established a cause of action for interference. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Seven through Nine are overruled.

In Points of Error Nos. Ten through Twelve, State National challenges the legal sufficiency of the evidence to support the jury's finding in special issue Question No. 2, that any act or acts inquired about in special issue Question No. 1 proximately caused any damage to FMC, either by fraud (point no. ten), by duress (point no. eleven), or by interference (point no. twelve). In conjunction with the foregoing, it is alleged that: (a) neither State National nor any other lender caused the FMC board's actions; (b) State National is not liable for acts by FMC's directors that FMC has acknowledged were proper; and (c) any alleged injury to FMC resulted from Farah's failure to exercise his voting con-

trol. Point of Error No. Thirteen states that the evidence is factually insufficient to support the finding.

■ The two elements of proximate cause are cause in fact and foreseeability. Both elements must be present and may be established by direct or circumstantial evidence. Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred. *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901 (Tex.1980). Foreseeability is established by proof that the actor, as a person of ordinary intelligence and prudence should have anticipated the danger to others [by his act]. The rule does not require that he anticipate just how injuries will grow out of the situation. *Clark v. Waggoner*, 452 S.W.2d 437 (Tex.1970).

■ Proximate cause is an issue to be determined by the trier of fact. *Clark v. Waggoner*, supra. It cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force, *McClure v. Allied Stores of Texas, Inc.*, supra, which is based upon reasonable probabilities and which precludes the fact finder from having to make an arbitrary choice between unproven conclusions. *Insurance Company of North America v. Myers*, 411 S.W.2d 710 (Tex. 1966).

■ The foregoing rule applies to situations wherein the proof discloses that a given result may have occurred by more than one proximate cause and whereby the fact finder must ascertain the efficient cause. *Lenger v. Physician's General Hospital, Inc.*, 455 S.W.2d 703 (Tex.1970). Where injury or damage has resulted from a wrongful act which is the original cause of an event, in that such event is a part of a chain of events set in motion by a party, such party may be held responsible for the total results. *Holt v. Ray*, 435 S.W.2d 568 (Tex.Civ.App.—Eastland, 1968, no writ), citing *El Paso Electric Co. v. De Nunez*, 118 S.W.2d 914 (Tex.Civ.App.—El Paso 1938,

writ dism'd). As set forth in *Clark v. Waggoner*, supra at 440:

> The act of a third person which intervenes and contributes a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer if such act ought to have been foreseen.... An act wanting in ordinary care which actively aids in producing an injury as a direct and existing cause need not be the sole cause; but it must be a concurring cause and such as might reasonably have been contemplated as involving the result under the attending circumstances.

■ Contrary to the arguments of State National, the evidence is legally and factually sufficient that the lenders proximately caused the actions of the board both on and after March 23. Azar was recognized as the swing vote. The evidence is legally and factually sufficient that the lenders caused: Azar's alteration of his position which had been to support Farah's return as CEO; Conroy's election as CEO; Farah's removal as board chairman; Gordon Foster's election to such position; and the non-election of Wood and Jaeger as directors. The evidence is legally and factually sufficient that, after March 23, the lenders proximately caused: the election of Williams, Jaynes and Pulley as directors; the hiring of the Grisanti and Galef firm as a consultant to FMC; and the sale of assets at auction.

According to State National, the lenders were not involved in FMC's operations. First, it argues that any damages sustained as result of the events on or after March 23 are attributable solely to the problems generated during FMC's prior management. Second, it maintains that none of the management decisions rendered by the board after March 23 were dictated by the lenders. Thus, it cannot be liable for any damages resulting from such decisions. It concludes that FMC's performance during the year in controversy was the product of various "inseparably entwined" circumstances unrelated to any lender. Despite such contentions, there is evidence that the

elements of proximate cause (cause in fact and foreseeability) exist. *McClure v. Allied Stores of Texas, Inc.,* supra. The acts of the lenders related to the events of March 23 set in motion a chain of foreseeable events from which FMC sustained injury and for which State National may be held accountable. *Clark v. Waggoner,* supra; *Holt v. Ray,* supra.

State National next argues that it was not liable for acts by FMC's directors that FMC has acknowledged were proper. It cites to the release by FMC on the claims asserted against the directors for their conduct on the board. Such claims were noted in the release to be "without merit." The release was introduced as an exhibit by FMC. State National contends that the release now constitutes a binding [judicial] admission by FMC that there was no improper board action for which State National can be held liable. There is no merit to this position.

■ A five-prong test has been prescribed in order to bind a party to an admission which is made by him or by his witness during the course of a judicial proceeding and which binds the party contrary to an essential fact embraced in his theory of recovery. One of these requirements is that the statement be deliberate, clear and unequivocal. *Tex-Wis Company v. Johnson,* 534 S.W.2d 895 (Tex.1976). When the statement is modified or explained by the party, it does not constitute a binding judicial admission which would defeat his right of recovery. *Esteve Cotton Company v. Hancock,* 539 S.W.2d 145 (Tex.Civ.App.— Amarillo 1976, writ ref'd n.r.e.). Where there is testimony by the party (or any of his witnesses) which contradicts the statement, the effect of all such testimony amounts to an equivocation and does not meet the requirement that the statement be clear and unequivocal. *William B. Roberts, Inc. v. McDrilling Company, Inc.,* 579 S.W.2d 335 (Tex.Civ.App.—Corpus Christi 1979, no writ). See: *Tex-Wis Company v. Johnson,* supra.

■ Notwithstanding the terms contained in the release, the evidence reflects that certain acts improperly undertaken by FMC's directors now form a basis of FMC's claim against State National. As such, the release may more properly constitute an informal statement made incidentally in the course of judicial proceedings which is inconsistent with FMC's present position. It may be inferred from the release that the facts in issue are not as FMC now claims. Thus, the release is an extra-judicial admission or quasi-admission. It is admissible against, but not conclusive upon, FMC. It merely forms a part of the evidence and its weight and probative force are matters for the jury. *Esteve Cotton Company v. Hancock,* supra.

■ In any event, the release does not absolve State National of liability. As stated in *McMillen v. Klingensmith,* 467 S.W.2d 193, 196 (Tex.1971):

> The rule is a simple one. Unless a party is named in a release, he is not released .... a release of a party or parties named or otherwise specifically identified fully releases only the parties so named or identified, but no others.

There is evidence that the election of the CEO depended upon the exercise by Farah of his voting power which Farah knew he had but which he failed to exercise. State National contends that any injury to FMC resulted from Farah's failure to exercise this power. However, the evidence clearly reflects that in March, 1977, Farah was constrained to exercise such power. In early March, 1977, he was threatened with suit by Clifford and Virginia Farah if he attempted to vote their trust stock for a new board or for his return to management. On March 23, he was subject to the warnings by the lenders that FMC would be bankrupted and padlocked if he were elected as CEO.

At the April 4 board meeting, he continued to feel intimidated by Donohoe. At the July 30 board meeting when Galef was elected as CEO, Farah was under the impression that Galef would have him serve as a consultant. Not until late in the year and after he was forced to resign as a

director did Farah determine that he had no choice but to exercise his voting power. Even then, it meant a confrontation with Clifford and Virginia Farah on his voting of the trust stock. Under the circumstances, it is not unreasonable that he failed to do so earlier.

State National has offered no legitimate reason why as a matter of law the acts of fraud, duress and interference did not proximately cause any damage to FMC. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Ten through Thirteen are overruled.

■ Point of Error No. Fourteen challenges the overruling of State National's motion for a new trial due to the erroneous submission of special issue Question No. 1, which asked the jury if State National acting alone or with any of the other lenders committed acts of fraud, duress and interference. We have fully considered the briefs and contentions of the parties regarding this point. We first reject the contention that the court was not afforded an opportunity to correct any errors in the charge so that the case could be properly submitted. See: *Northcutt v. Jarrett,* 585 S.W.2d 874 (Tex.Civ.App.—Amarillo) writ ref'd n.r.e. per curiam, 592 S.W.2d 930 (Tex.1979). We next determine that the merits of the point were not waived and should be considered. Rule 277, Tex.R. Civ.P. Having considered them, upon examination of the issue in question, the instructions related thereto, we believe the issue and the instructions clearly confined the jury to the facts as pled and proved. The trial court did not abuse its discretion in submitting the issue broadly or in submitting the related instructions. Since the issue and instructions were properly submitted, there was no abuse of discretion in refusing the requested issues and instructions of State National which were unnecessary to assist the jury in answering the questions. See: *Union Oil Company of California v. E.J. Richard,* 536 S.W.2d 955 (Tex.Civ.App.—Beaumont 1976, no writ). Point of Error No. Fourteen is overruled.

Points of Error Nos. Fifteen and Sixteen raise issue with the legal and factual sufficiency of the evidence to support the jury's finding of actual losses in special issue Question No. 3A. Actual losses were awarded in the amount of $2,668,000.00. Generally, State National contends that there is no evidence that it caused such damages to be incurred or that the losses were attributable to the alleged mistakes of FMC's management during the year in controversy (April, 1977, through March, 1978) or to any lender action as distinguished from circumstances existing or events occurring prior to that time.

■ Although the uncertainty of damage is not fatal to recovery once the fact of damage is established, it is nevertheless a reasonable degree of certainty with which the extent of damage must be shown. *Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097 (1938). Killman testified that FMC's operating loss totaled $10,162,000.00 during the year in controversy. State National argues, however, that there is no evidence with which its liability can be ascertained as to any portion thereof.

■ Its position is contrary to the evidence here and to the holding in *Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2,* 415 S.W.2d 890, 896 (Tex.1967). There, the court stated:

It is true that the evidence does not establish to a mathematical certainty the exact amount of damages caused by appellant alone, nor does it separate with exact accuracy the damages caused by appellant from that caused by others . . . ; but the law does not require such exactness. Where the evidence establishes that a plaintiff has suffered substantial damages, he is not to be denied a recovery merely because others than the defendant contributed to bring about his loss and he is unable to show distinctly the amount of damages contributed by each tort-feasor. All that the law requires is that the best evidence of which a case is susceptible be produced, and if

from such evidence the amount of damages caused by the defendant can be inferred or estimated by the jury with reasonable certainty, then the amount of such damages is for the jury.

Compare: *Globe Aircraft Corporation v. Thompson*, 203 S.W.2d 865 (Tex.Civ.App.— Fort Worth 1947, no writ).

The evidence is legally sufficient to support the jury's finding of $2,668,000.00. Cases cited by State National pertain to situations wherein there was no evidence to support a recovery of damages. The evidence is also factually sufficient to support the finding. Points of Error Nos. Fifteen and Sixteen are overruled.

Points of Error Nos. Seventeen through Nineteen address the legal and factual sufficiency of the evidence to support the jury's finding of lost profits in special issue Question No. 3B. Point of Error No. Seventeen states that there is no evidence to support the finding. In Point of Error No. Eighteen, State National alleges that the trial court erroneously rendered judgment on such finding because as a matter of law FMC is not entitled to a recovery. Point of Error No. Nineteen states that the evidence is factually insufficient to support the finding.

In contrast to the jury's finding of $15,-482,500.00, Killman testified that FMC lost profits totaling $51,232,000.00 (by use of the base period of 1959 through 1971). His calculations derived from the base period of 1959 through 1975 reflect lost profits totaling $24,377,000.00.

Numerous reasons are advanced by State National in support of its position that FMC has no legal basis for recovery. First, it is argued that the evidence does not distinguish between the effects of the lenders' alleged conduct and other known factors affecting FMC's profits. This argument is contrary to the holdings in cases previously cited. *Clark v. Waggoner*, supra; *Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2*, supra.

Numerous reasons are raised which, when construed together, allege that FMC's lost profits cannot be intelligently estimated. They are: there is no evidence that Killman's base period is comparable to the damage period; his testimony, the only evidence of lost profits, was based upon unproven, incomplete, contradictory and unreliable assumptions; the unpredictability of FMC's business rendered the projection of lost profits conjectural; and FMC was not an established business making a profit at the time of the alleged injury.

■ Unlike the situation in *Birge v. Toppers Menswear, Inc.*, 473 S.W.2d 79, 85 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r. e.), the evidence is legally sufficient that Killman's base period is comparable to the damage period. This is particularly true if the period of 1959 through 1975 is considered as the one upon which the jury based its finding. As stated in *Birge:*

If proof of lost profits is to be made by opinions or estimates of loss, these must be predicated upon factual data derived from previous operation of such business; e.g., previous profits earned, and similar facts and circumstances which afford a basis for the computation of such probable losses.

The general rule for the recovery of lost profits by an established business was set forth in *Southwest Battery Corporation v. Owen*, supra, 115 S.W.2d at 1098:

In order that a recovery may be had on account of loss of profits, the amount of loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in

business which might have been expected in light of past development and existing conditions.

Anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations or a change in business, or where there is no evidence from which they may be intelligently estimated. *Copenhaver v. Berryman,* 602 S.W.2d 540 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), citing *Southwest Battery Corporation v. Owen,* supra; *General Supply and Equipment Company, Inc. v. Phillips,* 490 S.W.2d 913 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.). In *Copenhaver,* the court utilized the appropriate standards for review in upholding the trial court's judgment which had *denied* recovery of lost profits. In *General,* at 920, it was held that there was no evidence in the record to support the estimate of lost profits. The testimony showed that there had never been a profit in the business allegedly damaged. See also: *Clarostat Mfg., Inc. v. Alcor Aviation, Inc.,* 544 S.W.2d 788 (Tex. Civ.App.—San Antonio 1976, writ ref'd n.r. e.), wherein it was held that there was no evidence in the record supporting the conclusion that the profits allegedly lost by the plaintiff were due to the defendant's breach of warranty.

Although the holding was based upon facts inapposite to those herein, the court in *Schoenberg v. Forrest,* 253 S.W.2d 331, 334 (Tex.Civ.App.—San Antonio 1952, no writ) determined that lost profits would be recoverable if the evidence showed the extent of the damages as a matter of just and reasonable inference. See: *Arabesque Studios, Inc. v. Academy of Fine Arts International, Inc.,* 529 S.W.2d 564 (Tex. Civ.App.—Dallas 1975, no writ).

Under the rules established for a party to recover lost profits, the evidence is legally and factually sufficient that the base and damage periods are comparable, especially in view of Killman's calculations derived from the period of 1959 through 1975, during the latter part of which FMC sustained heavy losses. FMC was an established business despite the fact that it had sustained these losses in the several years preceding the damage period. The omission of the year 1976 from either base period would not affect its ability to recover lost profits. The closely analagous case of *Verette v. Travelers Indemnity Company,* 645 S.W.2d 562 (Tex.App.—San Antonio 1982, no writ) supports these conclusions. See: *Pace Corporation v. Jackson,* 155 Tex. 179, 284 S.W.2d 340 (1955), wherein recovery of lost profits was allowed as to a wholesale business which had been in operation for a short period of time and which had not realized any profits during such period.

State National argues that FMC's recovery is dependent upon uncertain and changing conditions, such as market fluctuations in the men's apparel business. This unpredictability of FMC's business is stated to render the projection of lost profits conjectural. Admittedly, the men's apparel business is volatile in nature due to the changes in market demand. However, in *Pace v. Jackson,* supra, at 348, the court noted that any recovery of lost profits may be construed as being speculative.

Killman utilized a satisfactory methodology to calculate lost profits. See: *White v. Southwestern Bell Telephone Company, Inc.,* 651 S.W.2d 260 (Tex.1983). Killman's assumptions relied either upon facts in evidence or upon inferences reasonably drawn therefrom. This enabled him to properly render an expert opinion as to the profits lost by FMC. *Casey v. Barkley,* 527 S.W.2d 256 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); *Wheatheart Feeders, Inc. v. Pletcher,* 453 S.W.2d 902 (Tex. Civ.App.—Amarillo 1970, writ dism'd). The factual basis upon which he arrived at his expert opinion and the inadequacy or vulnerability of his opinion goes to the weight and credibility of his testimony rather than its admissibility. *Tenngasco Gas Gathering Company v. Fischer,* 624 S.W.2d 301 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); *Thate v. Texas & Pacific Railway Co.,* 595 S.W.2d 591 (Tex. Civ.App.—Dallas 1980, no writ); *Boyett v.*

*Enders,* 456 S.W.2d 701 (Tex.Civ.App.— Waco 1970, no writ).

Thus, the jury was entitled to weigh the evidence regarding lost profits. Apparently, it chose not to accept the entire amount as testified to by Killman. Even if the base period of 1959 through 1975 is the one upon which the jury relied, its finding is within the range of Killman's calculations. As it was free to do so, the jury must have determined that State National was not the sole cause of FMC's lost profits during the damage period.

As a final matter, State National argues that there is no rational basis for an award of lost profits after Farah's return as CEO in 1978. As stated by FMC, no limiting or explanatory instruction on the matter was requested. Notwithstanding that, the principal case upon which State National relies is not dispositive. *Lewis v. Mobil Oil Corporation,* 438 F.2d 500 (8th Cir.1971).

*Lewis* involved a cause of action for breach of warranty. The plaintiff, a sawmill operator, was allowed to recover lost profits for the period during which he was attempting to operate his machinery with defective oil acquired from the defendant. However he was not permitted to recover lost profits for the period following his discovery of the oil's unsuitability and during which he began using oil that was satisfactory. It was the plaintiff's contention that he was entitled to such recovery because of the expenses and shut-down time experienced during the period when the defective oil was in use. The court held in *Lewis,* supra, at 508:

> The failure to produce at full capacity during the period when he was not using [the defective oil] was not due to a breach of warranty but was clearly due to the plaintiff's capital resources. The defendant oil company cannot be held responsible for the capitalization of plaintiff's business. If it is indeed the case, as plaintiff contends, that there was a readily available market for his extra production at a reasonable profit, surely there were conventional sources available to finance this production.

At trial, Ray Williams testified that there had been a reduction in working capital during the damage period and that FMC had not fully recovered from the depressed sales and profits resulting therefrom. There is evidence that other problems were experienced during the leadership of Conroy and Galef which had an impact upon FMC's sales and profits. For these reasons, *Lewis* is distinguishable. FMC is entitled to the recovery of damages which would place it as nearly as possible in the position it would have occupied but for the injury in question. *Reaugh v. McCollum Exploration Co.,* supra.

As a matter of law, FMC is entitled to the recovery of lost profits. The evidence is legally and factually sufficient to support the jury's finding thereon. Points of Error Nos. Seventeen through Nineteen are overruled.

Points of Error Nos. Twenty through Twenty-two concern the legal and factual sufficiency of the evidence to support the jury's finding of auction damages in special issue Questions Nos. 3C and 3D. In Point of Error No. Twenty State National contends that there is no evidence that State National was responsible for FMC's selection of the auction method of sale nor that the amount received was less than the market value. State National argues that the jury finding in special issue Question No. 3C was calculated pursuant to the claim that it was responsible for the fact of sale and that there is no evidence of a market value other than the auction market for assets sold and thus no basis for the jury's apparent finding of some market value other than that established at the October auction. For the reasons set forth in regard to Point of Error No. Twenty, State National asserts in Point of Error No. Twenty-one that recovery of lost profits from auction sales is improper because as a matter of law FMC is not entitled thereto and that there is no evidence of any such loss of profits. State National argues that the interest effects as testified to by Killman do not constitute lost profits and that Killman's theory is invalidated due to his

oversight of the fact that the loss of profits relies upon orderly liquidation value contemplated by the disposition of assets through protracted and piecemeal sales, and if the proceeds from such sales were used to pay down the loan, then payments would be piecemeal and would at times be different. Point of Error No. Twenty-two contends the evidence is factually insufficient to support the finding of any damages arising from the auction sales.

We refer first to the rule as stated in *Wendlandt v. Wendlandt,* 596 S.W.2d 323, 325 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ):

Fair market value has been consistently defined as the amount that a willing buyer, who desires to buy, but is under no obligation to buy would pay to a willing seller, who desires to sell, but is under no obligation to sell.... This standard or test presupposes an existing, established market.

The lower of Kitson's figures ($1,300,670.00) which he described as the orderly liquidation value of the assets sold, fits within this definition. Despite the fact that no other markets were shown by Kitson to exist, the jury was entitled to rely upon the lower figure. *Lo-Vaca Gathering Co. v. Moore,* 403 S.W.2d 161 (Tex.Civ.App.—Austin 1966, no writ). Kitson testified that the orderly liquidation value was basically the same as fair market value in this instance. However, he also provided the jury with two figures, $1,300,670.00 as the orderly liquidation value and $1,600,775.00 as fair market value. We believe the Appellee is bound by such testimony to the lower figure under the charge of the court. It is clear that the jury employed the larger figure. In other words, the jury took the larger of Kitson's figures, $1,600,775.00, and subtracted the gross proceeds received from the auction, that is $878,926.23, to arrive at their verdict of $721,848.77 in response to special issue Question No. 3C. A jury is entitled to weigh expert testimony regarding the value of the property and any damage sustained thereto. *Maxey v. Texas Commerce Bank of Lubbock,* 571 S.W.2d 39 (Tex.Civ.App.—Amarillo 1978), writ ref'd n.r.e. 580 S.W.2d 340 (1979). However, the evidence only supports deducting the proceeds from $1,300,670.00 and a verdict of $421,743.77 in response to special issue Question No. 3C. Appellee's suggestion of remittitur at page 206 of its original brief should be granted in the sum of $300,105.00, this Court finding the damages specified to be excessive in that amount. A reviewing court may reduce the amount of the trial court's judgment to conform to the evidence. In doing so, we are empowered to reform the judgment entered. *Wenk v. City National Bank,* 613 S.W.2d 345 (Tex.Civ.App.—Tyler 1981, no writ), and cases therein cited. Aside from the excess in damages, State National has not advanced any authoritative reason why FMC is not entitled to recovery of auction damages as a matter of law. With the reformation of the damages in special issue Question No. 3C, the evidence is legally and factually sufficient to support the jury's findings of auction damages. Points of Error Twenty through Twenty-two, aside from the reformation under Point of Error Twenty-two, are overruled.

Point of Error No. Twenty-three urges error in the damage submission contained in special issue Question No. 3 and the accompanying instruction on "market value." We have considered all of Appellant's contentions regarding this question and believe that the trial court, in exercising its discretion, properly submitted the issue and instructions to enable the jury to make an award of damages on proper grounds and correct principles of law. Any error arising from the instructions has been remedied by our reduction of the jury's findings as to auction damages. From an examination of State National's requested instructions, we believe the trial court did not abuse its discretion in refusing to submit them, as they were unnecessary to assist the jury in answering the various questions regarding damages. *Thomas v. Oil & Gas Building, Inc.,* 582 S.W.2d 873 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Specifically, we

respond to Appellant's requested instructions relating to lost profits for duress and fraud. As to duress, duress is a tort in Texas. *Housing Authority of City of Dallas v. Hubbell*, supra. The fundamental principle underlying all rules of damages, other than punitive, is to indemnify the injured party for the pecuniary loss suffered, to place him as nearly as possible in the position he would have occupied but for the injury. *Reaugh v. McCollum Exploration Co.*, supra and see: *McClung Cotton Co., Inc. v. Cotton Concentration Co.*, 479 S.W.2d 733 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). As to fraud the measure is that which affords the complaining party the amount of loss resulting directly and proximately upon him. *Morriss-Buick Co. v. Pondrom*, 131 Tex. 98, 113 S.W.2d 889 (Tex.Comm'n App.1938, opinion adopted); *Traylor v. Gray*, 547 S.W.2d 644 (Tex.Civ. App.—Corpus Christi 1977, writ ref'd n.r. e.). Fraud allows recovery for lost income, *Success Motivation Institute, Inc. v. Lawlis*, 503 S.W.2d 864 (Tex.Civ.App.—Houston [1st Dist] 1973, writ ref'd n.r.e.) and for loss of probable yield of crops. *International Harvester Company v. Kesey*, 507 S.W.2d 195 (Tex.1974). FMC is entitled to recovery for duress and fraud. Furthermore, lost profits are recoverable for tortious interference. *Beam v. Voss*, 568 S.W.2d 413 (Tex.Civ.App.—San Antonio 1978, no writ); *Tippett v. Hart*, supra. Nor do we believe that special issue Questions Nos. 3A and 3B permit a double recovery. In view of the evidence which distinguished actual losses from lost profits, we need not suspect that the jury confused the terms. Both are terms of common usage and meaning which can be readily understood. See: *Mangham v. Hall*, 564 S.W.2d 465 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). Point of Error No. Twenty-three is overruled.

Points of Error Nos. Twenty-four and Twenty-five challenge the legal and factual sufficiency of the evidence to support the conspiracy finding of the jury in response to special issue Question No. 1. An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Company*, 652 S.W.2d 932 (Tex.1983). We believe the evidence is legally and factually sufficient to establish all essential elements of an actionable civil conspiracy set forth in *Massey v. Armco Steel Company*, supra. Points of Error Nos. Twenty-four and Twenty-five are overruled.

Point of Error No. Twenty-six urges error in the admission of a substantial amount of evidence which Appellant contends had the cumulative effect of prejudicing State National. The point concerns forty-five documents and four hundred pages of testimony. Even with a liberal interpretation of Rule 418(d) Tex.R.Civ.P., the point is multifarious. Appellant's argument that the cumulative effect is prejudicial merely compounds the problem of directing the court's attention to the error relied upon and of enabling the Court to determine the question of reversible error. Rule 418(e) Tex.R.Civ.P. Nor has Appellant demonstrated that the evidence complained of was reasonably calculated to and probably did cause the rendition of an improper judgment. See: *Hernandez v. Heldenfels*, 374 S.W.2d 196 (Tex.1963); *Pittman v. Baladez*, 312 S.W.2d 210 (Tex. 1958). Point of Error No. Twenty-six is overruled.

By Point of Error No. Twenty-seven, State National asks this Court to reverse and render, or alternatively, reverse and remand. We have determined that the proper disposition is to reform and affirm. The point is overruled.

FMC urges one cross-point and two conditional cross-points. The first complains of the trial court's definition of malice in regard to exemplary damages. The other two concern exclusion of certain evidence in regard to damages and the court's failure to order production of certain documents. We find no merit in any of the cross-points. Its first point has not been preserved. *Chappell v. Dwyer*, 611 S.W.2d 158 (Tex.Civ.App.—El Paso 1981,

no writ). As to the damage point, the "before and after" approach is the accepted method of calculating lost profits in Texas. *Southwest Battery Corporation v. Owen,* supra. In regard to the production question, the attorney-client privilege precluded production. *Maryland American General Insurance Company v. Blackmon,* 639 S.W.2d 455 (Tex.1982). Appellee's cross-points are overruled.

Appellee's suggestion of remittitur in the sum of $300,105.00 is granted and the trial court's judgment is reformed to award Appellee judgment in the total sum of $18,647,243.77 (instead of $18,947,348.77). Otherwise, the judgment of the trial court is in all things affirmed.

Reformed, and as reformed, affirmed.